## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BRYAN H. SIMMS** | : | |
| **32 Hitchcock Rd.** | : | |
| **Westport, CT 06880,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case:  1:08-cv-00177-RWR** |
| **v.** | : | **Hon. Richard W. Roberts** |
| | : | |
| **BALL STREET VENTURES, LLC** | : | |
| **1000 Wisconsin Ave., N.W., Suite G-100** | : | |
| **Washington, D.C. 20007;** | : | |
| | : | |
| **BALL STREET PARTNERS, LLC** | : | |
| **1000 Wisconsin Ave., N.W., Suite G-100** | : | |
| **Washington, D.C. 20007;** | : | |
| | : | |
| **BALL STREET FUND, LLC** | : | |
| **1000 Wisconsin Ave., N.W., Suite G-100** | : | |
| **Washington, D.C. 20007;** | : | |
| | : | |
| **CHRISTIAN LAETTNER** | : | |
| **1041 Ponte Verda Blvd.** | : | |
| **Ponte Verda Beach, FL 32082; and** | : | |
| | : | |
| **BRIAN K. DAVIS** | : | |
| **2230 Massachusetts Ave., N.W.** | : | |
| **Washington, D.C. 20008,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## DEFENDANTS' ANSWER TO COMPLAINT AND COUNTERCLAIMS

Defendants Ball Street Ventures, LLC and Ball Street Partners, LLC, ("Defendants"),

through their attorneys, submit the following Answer to the Complaint of Plaintiff Bryan H.

Simms ("Plaintiff")[1], and Counterclaims:

---

[1] Defendants are contemporaneously filing a Motion to Dismiss Counts II and III of Plaintiff's
Complaint, and thus do not file an Answer to those Counts.

## PARTIES

1.      Plaintiff Bryan H. Simms is a natural person, domiciled at the address set forth in the caption, and a citizen of the state of Connecticut.

**ANSWER:**    Defendants admit that Plaintiff Bryan H. Simms is a natural person.  Defendants

are without knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 1 and therefore deny them.

2.      To the best of Plaintiff's knowledge, information and belief, Defendant Ball Street Ventures ("BSV") is a Delaware limited liability corporation with its principal place of business in the District of Columbia at the address set forth in the caption.  Also to the best of Plaintiff's knowledge, information and belief, Defendant Ball Street Ventures is registered to conduct business in the District of Columbia and has Corporation Service Company, 1090 Vermont Ave., N.W., Washington, DC 20005 ("CSC") as its registered agent for service in the District of Columbia.  Also to the best of Plaintiff's knowledge, information and belief, Defendant Ball Street Ventures is not registered to conduct business, and has no registered agent for service, in the Commonwealth of Virginia.

**ANSWER:**    Admitted.

3.      To the best of Plaintiff's knowledge, information and belief, Defendant Ball Street Partners ("BSP") is a Delaware limited liability corporation with its principal place of business in the District of Columbia at the address set forth in the caption.  Also to the best of Plaintiff's knowledge, information and belief, Defendant Ball Street Partners is not registered to conduct business, and has no registered agent for service, in the District of Columbia.  Also to the best of Plaintiff's knowledge, information and belief, Defendant Ball Street Partners is not registered to conduct business, and has no registered agent for service, in the Commonwealth of Virginia.

**ANSWER:**    Admitted.

4.      To the best of Plaintiff's knowledge, information and belief, Defendant Ball Street Fund ("BSF") is a Delaware limited liability corporation with its principal place of business in the District of Columbia at the address set forth in the caption.  Also to the best of Plaintiff's knowledge, information and belief, Defendant Ball Street Fund is registered to conduct business, and has CSC as its registered agent for service, in the District of Columbia. Also to the best of Plaintiff's knowledge, information and belief, Defendant Ball Street Fund is not registered to conduct business, and has no registered agent for service, in the Commonwealth of Virginia.

**ANSWER:**    Admitted.

5.     Defendants BSV, BSP, and BSF shared and co-determined matters governing essential terms and conditions of employment and were Mr. Simms' joint employers.

**ANSWER:**     Denied.


6.     Defendant Christian Laettner is a natural person who, to the best of Plaintiff's knowledge, information and belief, is domiciled at the address set forth in the caption and a citizen of the state of Florida.

**ANSWER:**     Admitted.


7.     Defendant Brian K. Davis is a natural person who, to the best of Plaintiff's knowledge, information and belief, is domiciled at the address set forth in the caption and a citizen of the District of Columbia.

**ANSWER:**     Admitted.


## JURISDICTION

8.     The Court has original jurisdiction of this civil action because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.  28 U.S.C. § 1332.

**ANSWER:**     Admitted.


## VENUE

9.     Venue is proper because some of the Defendants reside, and a substantial part of the events giving rise to the claims occurred, in this judicial district. 28 U.S.C. § 1391(b).

**ANSWER:**     Admitted.


## FACTUAL ALLEGATIONS

10.     Defendants BSV and BSP entered into a valid and enforceable Employment Agreement with Mr. Simms effective September 10, 2007, engaging him as BSV's Chief Executive Officer ("Employment Agreement").

**ANSWER:**     Defendants admit that they entered into an employment agreement with Plaintiff

on or about September 10, 2007, the form of which is attached hereto as Exhibit A.  Defendants

further admit that the terms of the agreement were as stated in Exhibit A.  Defendant deny that

the agreement is valid and enforceable.

11.    Mr. Davis took the lead in recruiting Mr. Simms away from at Lehman Brothers of New York ("Lehman").  Mr. Davis and Mr. Simms had been friendly for approximately eighteen (18) years, having met in college and remaining in contact during that time, through which Mr. Davis acquired knowledge of Mr. Simms' career as it developed.

**ANSWER:**    Defendants admit that Mr. Davis and Mr. Simms met in college.  Defendants deny

the remaining allegations of Paragraph 11.

12.    After recruiting Mr. Simms for some time, Defendants made him an offer sufficient to lure him away from the lucrative and successful career he had built at Lehman.

**ANSWER:**    Defendants admit that they made an offer of employment to Plaintiff.  Defendants

deny the remaining allegations of Paragraph 12.

13.    In offering Mr. Simms employment, Defendants acknowledged that Mr. Simms was resigning from his position as Senior Vice President with Lehman to accept their offer of employment.

**ANSWER:**    Defendants admit that the employment agreement applicable to Plaintiff (Exhibit

A) states that Defendants so acknowledged.  Defendants deny the remaining allegations of

Paragraph 13.

14.    Defendants further acknowledged that Mr. Simms would have an obligation to repay Lehman a loan in the principal amount of $742,847.16, plus interest at Lehman's margin rate of interest ("Lehman Loan"), which loan would have been forgiven had Mr. Simms not left Lehman to accept Defendants' employment offer.

**ANSWER:**    Defendants admit that the employment agreement applicable to Plaintiff (Exhibit

A) states that Defendants so acknowledged.  Defendants deny the remaining allegations of

Paragraph 14.

15.    In the process of recruiting and hiring Mr. Simms,

     a.      Defendants did not request or receive a resume from Mr. Simms;

     b.      Defendants did not request or receive an employment application from Mr. Simms;

     c.      Defendants did not formally interview Mr. Simms or inquire about his duties with Lehman or any other prior employer;

     d.      Defendants did not request or receive a list of professional references from Mr. Simms; and

     e.      Defendants did not, to the best of Plaintiff's knowledge, information and belief, contact any person to whom Mr. Simms had reported at Lehman, or at Mr. Simms' other prior employers, to inquire of his duties or responsibilities while employed there.

**ANSWER:**    Denied.

16.    Each and every representation of material fact that Mr. Simms made to Defendants, or any of them during the process of Defendants' recruiting and hiring him was truthful.

**ANSWER:**    Denied.

17.    To lure Mr. Simms away from Lehman, Defendants offered him:

     a.      The position of Chief Executive Officer;

     b.      An initial annual base salary of $1,200,000;

     c.      An immediately vested 15% interest in BSP;

     d.      Reimbursement for payments on the Lehman Loan;

     e.      Reimbursement for business travel and entertainment expenses;

     f.      Participation in all employee health and pension benefit plans; and

     g.      In the event Defendants terminate Mr. Simms without cause, one year's salary paid over six months; payment of COBRA premiums for Mr. Simms and his family; and $15,000 for outplacement services, due on the first day of the first month following termination.

**ANSWER:**    Defendants admit that the terms of Plaintiff's employment were as stated in the

employment agreement applicable to Plaintiff (Exhibit A).  To the extent that the allegations of

Paragraph 17 are inconsistent with that agreement, Defendants deny them.

18.    On October 30, 2007, Mr. Simms offered and BSV accepted a loan from Mr. Simms in the amount of $200,000.00, which BSV agreed to repay with interest at the rate of 10 percent ("BSV Loan").

**ANSWER:**     Defendants admit that on or about October 30, 2007, Plaintiff offered a loan in the amount of $200,000, which was accepted.     Defendants deny the remaining allegations of Paragraph 18.

19.     At no time did Defendants have "Cause," as defined in the Employment Agreement, to terminate the Employment Agreement.

**ANSWER:**     Denied.

20.     Mr. Simms has remained at all times ready, willing, and able to perform his duties under the Employment Agreement.

**ANSWER:**     Denied.

21.     On or about December 5, 2007, Defendants informed Mr. Simms by email that they considered the Employment Agreement null and void.

**ANSWER:**     Admitted.

22.     Defendants have failed and refused to honor their obligations to Mr. Simms under the Employment Agreement, including without limitation, by:

    a.    Failing and refusing to pay Mr. Simms' salary pursuant to the Employment Agreement for and after October 2007;

    b.    Failing and refusing to reimburse Mr. Simms pursuant to the Employment Agreement for travel and entertainment expenses;

    c.    Failing and refusing to provide Mr. Simms pursuant to the Employment Agreement employee welfare and pension benefits;

    d.    Failing and refusing to repay the BSV loan or any interest accruing thereon; and

    e.    Anticipatorily refusing to honor their obligations under the Employment Agreement to pay reimbursement on the Lehman Loan, to pay Mr. Simms severance, to pay Mr. Simms $15,000 for outplacement services, and to pay COBRA premiums for Mr. Simms and his family; and

    f.    Anticipatorily refusing to repurchase, or make arrangements to calculate and repurchase, Mr. Simms' 15% equity interest in BSP pursuant to the Employment Agreement.

**ANSWER:**     Denied.

## COUNT I
## BREACH OF EXPRESS CONTRACT

23.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 22.

**ANSWER:**    Defendants incorporate by reference their responses to the allegations of

Paragraphs 1 through 22, as if fully restated herein.


24.    Through the acts and omissions alleged in this Complaint, Defendants have breached the Employment Agreement.

**ANSWER:**    Denied.


25.    As a result of Defendants' breach, Mr. Simms has suffered and will continue to suffer damages in an amount to be proven at trial.

**ANSWER:**    Denied.


26.    Defendants have withheld, and continue to withhold, benefits to which Mr. Simms is patently entitled and have done so in bad faith, vexatiously, wantonly, and for oppressive reasons.

**ANSWER:**    Denied.


27.    As de facto general partners of BSV, BSP, and BSF, Defendants Davis and Laettner are jointly and severally liable for all damages assessed against BSV, BSP, and/or BSF.

**ANSWER:**    Denied.


## COUNT IV
## ANTICIPATORY BREACH OF CONTRACT

39.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 38.

**ANSWER:**    Defendants incorporate by reference their responses to the allegations of

Paragraphs 1 through 27, as if fully restated herein.


40.    Pursuant to the Employment Agreement, Plaintiff is entitled to ongoing payments and benefits, including without limitation, severance payments equivalent to one year's salary paid over six months, reimbursement on the Lehman Loan, $15,000 for outplacement services,

and payment of COBRA premiums throughout the COBRA period for Mr. Simms and his family.

**ANSWER:**    Defendants state that the terms of the employment agreement (Exhibit A) speak for themselves.  Defendants deny that Plaintiff is entitled to any of the listed payments and benefits.

41.    Defendants have confirmed that they do not intend to honor their obligations to Mr. Simms under the Employment Agreement, including those that have accrued and those that will accrue.

**ANSWER:**    Defendants deny that they have any outstanding obligations to Plaintiff.

42.    As a result of Defendants' anticipatory breach of contract, Mr. Simms has suffered and will continue to suffer damages in an amount to be proven at trial.

**ANSWER:**    Denied.

43.    Defendants have withheld, and continue to withhold, benefits to which Mr. Simms is patently entitled and have done so in bad faith, vexatiously, wantonly, and for oppressive reasons.

**ANSWER:**    Denied.

44.    As de facto general partners of BSV, BSP, and BSF, Defendants Davis and Laettner are jointly and severally liable for all damages assessed against BSV, BSP, and/or BSF.

**ANSWER:**    Denied.

## COUNT IV -
## BREACH OF IMPLIED CONTRACT (ASSERTED IN THE ALTERNATIVE)

45.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 44.

**ANSWER:**    Defendants incorporate by reference their responses to the allegations of Paragraphs 1 through 27, and 39 through 44, as if fully restated herein.

46.    Mr. Simms rendered valuable services to Defendants at their request, which services were accepted by them under circumstances that reasonably notified them that Mr.

Simms expected Defendants to pay him, and that would make it unjust for them to retain the services without paying for them. The parties reached agreement as to all the material terms, including Mr. Simms' compensation, as expressed in precise terms in the Employment Agreement.

**ANSWER:**     Denied.


47.     Through the acts and omissions alleged in this Complaint, Defendants have breached the contract implied in law.

**ANSWER:**     Denied.


48.     As a result of Defendants' breach, Mr. Simms has suffered and will continue to suffer damages in an amount to be proven at trial.

**ANSWER:**     Denied.


49.     Defendants' conduct was willful, calculated. flagrant, and in disregard of obligations of trust.

**ANSWER:**     Denied.


50.     Defendants have withheld, and continue to withhold, benefits to which Mr. Simms is patently entitled and have done so in bad faith, vexatiously, wantonly, and for oppressive reasons.

**ANSWER:**     Denied.


51.     As de facto general partners of BSV, BSP, and BSF, Defendants Davis and Laettner are jointly and severally liable for all damages assessed against BSV, BSP, and/or BSF.

**ANSWER:**     Denied.


## ADDITIONAL DEFENSES

### First Affirmative Defense

Plaintiff's claims are barred because they fail to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiff's claims are barred because the agreement on which those claims rely is voidable and/or unenforceable because of fraudulent inducement.

### Third Affirmative Defense

Plaintiff's claims are barred by the doctrine of unclean hands.

### Fourth Affirmative Defense

Plaintiff's claims are barred by Plaintiff's failure to mitigate his damages.

### Fifth Affirmative Defense

Plaintiff's claims are barred by the doctrine of unilateral mistake.

## COUNTERCLAIM

Defendants/Counter-plaintiffs Ball Street Ventures, L.L.C. ("BSV") and Ball Street Partners, L.L.C ("BSP"), through their attorneys, hereby state as follows for their Counterclaims against Plaintiff/Counter-defendant Bryan H. Simms ("Simms"):

### The Parties

1.       Counter-plaintiff BSV is a Delaware limited liability corporation, with its principal place of business in the District of Columbia.  Its members are Brian K. Davis, a citizen of the District of Columbia, and Christian Laettner, a citizen of the state of Florida.

2.       Counter-plaintiff BSP is a Delaware limited liability corporation, with its principal place of business in the District of Columbia.  Its members are Brian K. Davis, a citizen of the District of Columbia, and Christian Laettner, a citizen of the state of Florida.

3.       Counter-defendant Simms was formerly employed as BSV's Chief Executive Officer, and upon information and belief, is a citizen of Connecticut.

### Jurisdiction and Venue

4.       Based on Simms' representations in his Complaint regarding his citizenship, this Court has diversity jurisdiction pursuant to 28 U.S.C. §1332, because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.       Venue in this District is proper pursuant to §1391(a).

### Background

6.       BSV and BSP are real estate development companies, formed to capitalize on development opportunities in the District of Columbia and other areas of the United States.

7.      Early in 2007, Simms approached Davis about the potential for doing business together.  Simms was aware of the real estate ventures Davis had been undertaking, and represented to Davis that he would be able to assist Davis greatly with those ventures.

8.      As a result of their shared college experience at Duke University, Brian Davis ("Davis"), a member of BSV and BSP, and Simms had been acquainted for nearly twenty years.

9.      The long-standing relationship between Simms and Davis gave rise to Davis placing a great deal of trust in Simms.

10.     Further, Simms' representations about his experience at Lehman Brothers, to both Davis and other representatives of BSV, caused Davis to believe that Simms would be a valuable addition to the BSV team.

11.     Davis therefore decided to hire Simms as the Chief Executive Officer for BSV, and, on or about September 10, 2007, entered into an agreement with Simms regarding his employment.

## COUNT I:  FRAUDULENT INDUCEMENT

12.     Counter-plaintiffs reallege and incorporate by reference all allegations contained in Paragraphs 1 through 11, as if fully restated herein.

13.     Prior to his employment with BSV and in the course of negotiations leading to that employment, Simms represented to Davis, as well as to in-house counsel for BSV, that he was a successful executive with Lehman Brothers.

14.     Specifically, Simms stated that he had personally managed $2½ billion in funds while he was at Lehman Brothers, as his own personal book of business.

15.     Simms also stated that, immediately upon leaving his employment with Lehman Brothers, he would be in a position to approach his personal clients and entice them to invest in

BSV. Simms stated that he had the approval of representatives of Lehman Brothers to so solicit his clients for BSV.

16.     In addition to misrepresenting his employment with Lehman Brothers and other factual misrepresentations, Simms also falsely told Davis that he would bring $20 million in capital to invest in BSV.

17.     The statements, or misrepresentations, also made to third parties by Davis and Timothy Clinton, and never corrected, described in Paragraphs 13 through 16 were false representations.

18.     Simms intentionally and knowingly made the misrepresentations described in Paragraphs 13 through 16.

19.     In making the misrepresentations described above, Simms intended to mislead BSV and BSP.

20.     BSV and BSP relied upon Simms' misrepresentations in offering employment to Simms, and would not have entered into an employment agreement with Simms had the misrepresentations not been made.

21.     As a result of their reliance on Simms' misrepresentations, BSV and BSP have suffered damages.

WHEREFORE, Counter-plaintiffs respectfully request that this Court grant it the following relief:

a.     Award Counter-plaintiffs damages for all compensable injuries, in an amount to be proven at trial, in an amount to be proven at trial but currently believed to exceed $250,000;

b.     Award Counter-plaintiffs exemplary and punitive damages in an amount to be proven at trial;

c.      Assess and award Counter-plaintiffs interest upon the damages awarded, including prejudgment interest; and

d.      Grant Counter-plaintiffs any and all other relief it deems just, including costs and fees.

## COUNT II:  BREACH OF CONTRACT

22.     Counter-plaintiffs reallege and incorporate by reference all allegations contained in Paragraphs 1 through 21, as if fully restated herein.

23.     On or about September 10, 2007, Simms signed an Employment Agreement with BSV and BSP.

24.     The terms of that Agreement required Simms to devote his "effort, time, energy, and skill" to the duties of Chief Executive Officer for BSV.

25.     During the term of his employment with BSV, Simms failed to properly devote his effort, time, energy, and skill to his duties for BSV.  For example, Simms did not reach out to his clients to raise monies he had promised.

26.     Simms has therefore breached his Employment Agreement with BSV and BSP.

27.     As a result of Simms' breach of his Employment Agreement, BSV and BSP have been damaged.

WHEREFORE, Counter-plaintiffs respectfully request that this Court grant them the following relief:

a.      Award Counter-plaintiffs damages for all compensable injuries, in an amount to be proven at trial but currently believed to exceed $250,000;

b.      Assess and award Counter-plaintiffs interest upon the damages awarded, including prejudgment interest; and

c.      Grant Counter-plaintiffs any and all other relief it deems just, including costs and fees.

### COUNT III:  CONSTRUCTIVE FRAUD

28.      Counter-plaintiffs reallege and incorporate by reference all allegations contained in Paragraphs 1 through 27, as if fully restated herein.

29.      The statements, or misrepresentations, described in Paragraphs 13 through 16 were false representations.

30.      Simms made the misrepresentations described in Paragraphs 13 through 16 innocently or negligently.

31.      BSV and BSP relied upon Simms' misrepresentations in offering employment to Simms, and would not have entered into an employment agreement with Simms had the misrepresentations not been made.

32.      As a result of their reliance on Simms' misrepresentations, BSV and BSP have suffered damages.

WHEREFORE, Counter-plaintiffs respectfully request that this Court grant it the following relief:

a.      Award Counter-plaintiffs damages for all compensable injuries, in an amount to be proven at trial, in an amount to be proven at trial but currently believed to exceed $250,000;

b.      Award Counter-plaintiffs exemplary and punitive damages in an amount to be proven at trial;

c.      Assess and award Counter-plaintiffs interest upon the damages awarded, including prejudgment interest; and

d.      Grant Counter-plaintiffs any and all other relief it deems just, including costs and fees.

## <u>JURY DEMANDED</u>

Defendants demand a trial by jury of all issues triable by a jury under Rule 38 of the

Federal Rules of Civil Procedure.


Dated:  April 24, 2008                    Respectfully submitted,

                                                       By: <u> /s/ Jeffrey S. Jacobovitz</u>
                                                       Jeffrey S. Jacobovitz, Esq.
                                                       Schiff Hardin LLP
                                                       D.C. Bar # 346569
                                                       1666 K Street, N.W., Suite 300
                                                       Washington, D.C. 20006
                                                       Tel:  (202) 778-6400
                                                       Fax:  (202) 778-6460
                                                       Email:  <u>jjacobovitz@schiffhardin.com</u>

                                                       *Attorney for Defendants Ball Street Ventures, L.L.C.*
                                                       *and Ball Street Partners, L.L.C.*

# EXHIBIT A

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into as of September __, 2007 between Ball Street Ventures LLC, a Delaware limited liability company (the "Company"), Ball Street Partners. LLC ("*Partners*"), and Bryan H. Simms, a resident of Connecticut ("Executive").

## BACKGROUND

The Company desires to employ Executive as Chief Executive Officer and Executive desires to accept employment with the Company on the terms and conditions set forth below. The parties acknowledge that Executive is resigning from his position as Senior Vice President with Lehman Brothers of New York to accept the Company's offer of employment set forth in this Agreement, and that as a consequence of Executive's termination of employment from Lehman Brothers, Executive will have an obligation to repay to Lehman a loan in the principal amount of $742,847.16, plus interest at Lehman's margin rate of interest. This loan would have been forgiven by Lehman Brothers had Executive continued in employment with Lehman Brothers.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

### TERMS OF ENGAGEMENT; DUTIES

*Section 1.1    Terms.* The Company hereby employs Executive as Chief Executive Officer, and Executive hereby accepts employment by the Company subject to the terms and conditions hereof. The Effective Date of this Agreement is September 10, 2007. Executive shall report to the Managing Partner of the Company and shall perform such lawful duties as are reasonably related to his Chief Executive Officer duties described herein.

*Section 1.2    Duties.* Throughout the term of this Agreement, Executive shall devote such portion of Executive's business effort, time, energy, and skill (reasonable vacations and reasonable absences due to illness excepted) as may be reasonably necessary to fulfill the duties of Chief Executive Officer of the Company. Executive shall not be required to relocate his residence from his residence in Connecticut.

*Section 1.3    Employment with Grizzlies Acquisition Holdings and/or related Companies.* The parties acknowledge and agree that, upon completion of purchase, Executive will also hold an executive position with Grizzlies Acquisition Holdings, or a related company, owning and operating the professional National Basketball Association franchise Memphis Grizzlies, at a salary of five hundred thousand dollars ($500,000.00) per year, and shall also receive a one percent (1%) interest in Grizzlies Acquisition Holdings and/or the related company. The Company agrees and acknowledges that Executive will spend effort, time, and

energy in connection with Executive's duties for the Memphis Grizzlies during the Term of this Agreement. The Company agrees and acknowledges that Executive's efforts and time spent on Memphis Grizzlies matters during the term of this Agreement is not violation of this Agreement or in conflict with Executive's duties to the Company.

Section 1.4   *Orbit Holdings Obligations to Executive.*   Company acknowledges and agrees that Executive is entitled to a 5% finders fee from Orbit Holdings on amounts up to $115 million with respect to amounts to be invested in Orbit Holdings. The parties acknowledge and agree that such payments by and obligations of Orbit Holdings to Executive are not in violation of or in conflict with Executive's duties to the Company.

## ARTICLE II

### COMPENSATION

In consideration of the services rendered by Executive pursuant to this Agreement, the Company shall pay or provide the following:

Section 2.1   *Base Salary.*   During the term of his employment hereunder, as of the Effective Date, Executive shall be paid a base salary of at least One Hundred Thousand Dollars ($100,000.00) per month (the "*Base Salary*"), which Base Salary will be reviewed by the President of the Company at least once each year and may be increased by the Company from time to time. The Base Salary shall be paid in accordance with the Company's standard payroll practices in effect from time to time. All payments to Executive hereunder shall be subject to such deductions and withholdings as are required by law or as authorized in writing by Executive to the extent permitted by law.

Section 2.2   *Benefits.*   The Company shall provide Executive medical, dental, disability, life insurance, and retirement benefits from the Company, and Executive shall participate in any executive or employee benefit plans, including but not limited to, any health, life, savings, pension, profit sharing, equity, or other benefit plans or practices in which other senior management employees of the Company participate. In addition, the Company agrees to provide Executive with the use of an office and such support services, staff and supplies as are consistent with his duties and status as Executive Officer of the Company and his residence in Connecticut.

Section 2.3   *Business Expenses.*   The Company shall reimburse Executive or otherwise provide and pay for all reasonable business, travel and entertainment expenses incurred by Executive in furtherance of or in connection with the business of the Company, subject to compliance with the reasonable expense reimbursement policies established by the Company and in sufficient detail to comply with Internal Revenue Service Regulations. In addition, the Company shall reimburse Executive or otherwise provide and pay for all professional and business affiliation expenses incurred by Executive.

Section 2.4   *Executive's Equity Interest in Ball Street Partners, LLC.*   Upon the Effective Date of this Agreement, Executive shall immediately receive a fifteen percent (15%) equity interest in Ball Street Partners, LLC ("*Partners*"). Executive's equity interest in *Partners*

shall at all times (including without limitation, after termination of Executive's employment) be subject to (1) the right of *Partners*, in the event Executive elects to sell his interest in *Partners*, to purchase Executive's equity interest at *Fair Market Value* ("Right of First Refusal"); and also (2) a right by *Partners* to require Executive to sell his equity interest in *Partners* at no lower valuation than that received by the majority equity interest of *Partners* ("Right to Drag Along"). Executive (or Executive's Estate if applicable) shall have the right, in the event the majority equity interest of *Partners* is sold, to require *Partners* to purchase his equity interest in *Partners* at the same valuation received by the majority equity interest of *Partners* ("Right to Tag Along"). After termination by Company of Executive's Company employment for any reason, Executive (or Executive's Estate if applicable) shall have the right to require *Partners* to purchase his equity interest in *Partners* at *Fair Market Value*. *Fair Market Value* shall mean the valuation agreed upon by Executive (or Executive's Estate if applicable) and *Partners* under the circumstances; *provided,* that if Executive (or Executive's Estate if applicable) and *Partners* are not able to agree upon the valuation, Executive and *Partners* shall each appoint certified public accountants to represent them and determine the valuation. In the event the representative certified public accountants cannot agree upon the valuation, the representative certified public accountants shall together select a third certified public accountant who shall determine the *Fair Market Value* and whose determination shall be final and binding on all parties.

    *Section 2.5    Signing Bonus.* The parties agree and acknowledge that Executive's former employer, Lehman Brothers, will require Executive to repay to Lehman a note, attached hereto, in the amount of seven hundred forty-two thousand, eight hundred forty-seven dollars and sixteen cents ($742,847.16), plus interest at Lehman's margin rate of interest, and that this note would have been forgiven by Lehman Brothers had Executive continued in employment with Lehman Brothers. To the extent Executive is required to pay any amounts due under the Lehman Notes, Company agrees to accept joint and several liability with Executive to pay such amounts on behalf of Executive as they come due to discharge Executive's obligations under the Lehman Notes, to the extent such amounts come due during the course of Executive's employment with Company.

    *Section 2.6    Grizzlies Holdings Compensation.* The foregoing compensation from the Company shall be in addition to the annual salary of five hundred thousand dollars ($500,000.00) and the a one percent (1%) ownership interest that Executive shall receive from Grizzlies Acquisition Holdings and/or related companies, upon completion of that purchase.

## ARTICLE III

### TERM AND TERMINATION

    *Section 3.1    Defined Terms.* The following terms used herein shall have the definitions set forth below:

        *"Cause"* means (i) conduct amounting to fraud or dishonesty against the Company or any subsidiary or affiliate of the Company; (ii) Executive's intentional misconduct, repeated refusal to follow the reasonable directions of the Managing Partner of the Company or material breach of this Agreement, *provided* the Managing Partner of the Company, upon the direction of the Partners, notifies Executive of the acts deemed to

constitute such intentional misconduct, repeated refusal or material breach in writing and Executive fails to correct such acts (or begin such action as may be necessary to correct such acts and thereafter diligently pursues the completion thereof) within five (5) business days after written notice has been given; or (iii) a conviction or plea of guilty or *nolo contendere* to a felony (other than one arising from the operation of a motor vehicle or resulting from actions taken (or not taken) by Executive in good faith in his capacity as an employee or officer of the Company).

*"Change in Control"* means (i) an acquisition of forty per cent (40%) or more of *Partners*, by a person who did not hold an ownership interest in *Partners* as of the Effective Date of this Agreement; (ii) a change in the Managing Partner of *Partners*; (iii) a merger or similar combination of Ball Street Ventures, LLC and/or *Partners* in which the current partners of *Partners* are not the controlling partners/owners of the surviving entity; or (iv) a sale of substantially all of the assets or liquidation of Ball Street Ventures, LLC or *Partners*. For purposes of this Agreement, the *Change in Control Effective Date* shall be the closing date of the sale or other disposition that accomplishes the *Change in Control*. For purposes of this Agreement, *Change in Control* does not apply to interests in *Partners* granted to employees of *Company* as part of their executive compensation.

*"Disability"* means (i) the inability of Executive to perform the duties of Executive's employment due to physical or emotional incapacity or illness, where such inability is reasonably expected to be of long-contained and indefinite duration (*i.e.*, for at least twelve (12) months); or (ii) Executive shall be entitled to (x) disability retirement benefits under the federal Social Security Act or (y) recover benefits under any long-term disability plan or policy maintained by the Company. In the event of a dispute, the determination of Disability shall be made reasonably by the Partners of the Company and shall be supported by advice of a physician competent in the area to which such Disability relates.

*"Effective Date"* means the date of this Agreement.

*"Good Reason"* means (i) any materially adverse change in the duties, responsibilities, total compensation and benefits package or status of the Executive to which he has objected in writing and the Company has not cured or taken reasonable steps to cure within thirty (30) days of receipt of such written objection; (ii) the assignment of Executive to a location outside of a fifty (50) mile radius from his current residence in Connecticut to which Executive has objected in writing to Company, and Company has not rescinded such assignment within thirty (30) days of receipt of such written objection; (iii) conduct on the part of the Company amounting to fraud or dishonesty against Executive; (iv) the Company's conviction or plea of guilty or *nolo contendere* to a felony; or (v) the occurrence of a *"Change in Control"* as defined herein, provided the Executive exercises his right to resign no later than six months after the *Change in Control Effective Date*, as defined above.

*Section 3.2* The term of this Agreement and of Executive's employment hereunder shall commence on the Effective Date and shall continue until terminated as provided herein.

Case 1:08-cv-00177-RWR Document 11-2 Filed 04/24/2008

Case 1:08-cv-00177-RWR    Document 11-2    Filed 04/24/2008    Page 6 of 11

(a)    Upon the death or Disability of Executive;

(b)    By the Company immediately for Cause;

(c)    By the Company, without Cause, immediately upon giving Executive written notice;

(d)    By Executive immediately for Good Reason;

(e)    By mutual agreement between Executive and the Company; or

(f)    By Executive upon forty-five (45) days' advanced written notice, during which time Executive shall continue to perform his duties hereunder.

Section 3.4    Remuneration.    Except as otherwise specified herein, upon termination of Executive's employment hereunder pursuant to this Article IV, the Company shall have no further obligation to Executive or Executive's estate or personal representative in the case of death with respect to remuneration due under this Agreement, except for salary and vacation pay, earned but unpaid at the date of termination, and such amounts, if any, due Executive under Section 2 hereof but unpaid as of the date of termination.

Section 3.5    Severance Payments.    Upon termination of Executive's employment hereunder pursuant to Section 3.3(c) or 3.3(d), the Company shall pay to Executive, as severance pay hereunder, (i) an amount equal to twelve (12) months of his then-current salary in effect at the time of termination paid in six equal payments over the first six months following his Date of Termination (as defined below); (ii) COBRA premiums to provide continued medical coverage at Company expense for Executive and his family throughout the COBRA period; and (iii) a $15,000.00 allowance for outplacement services for Executive due on the first day of the month following termination.

Upon termination of Executive's employment pursuant to Section 3.3(a), this Agreement shall terminate and no further salary, benefits or compensation of any type shall be payable to the Executive after the date of termination, except that the Executive or the Executive's estate, heirs or beneficiaries, as applicable, shall be entitled to any benefits specifically provided to them or the Executive under any benefit plan, and all compensation earned but not yet paid.

Upon termination of Executive's employment pursuant to Section 3.3(b) or 3.3(e) or 3.3(f), this Agreement shall terminate and no further salary, benefits or compensation of any type other than amounts due under Section 2 but not yet paid as of the date of termination, shall be paid to the Executive under the terms of this Agreement after the date of termination, except the Executive shall retain the right to participate in benefit plans under Section 2.3 subject to the terms of those plans and applicable federal and state law.

Executive's equity interest in Partners shall not be forfeited by termination of his employment for any reason, and the rights of the parties as provided in Section 2.5, including

without limitation the Right of First Refusal, Right to Drag Along, and Right to Tag Along, shall continue to apply to the Executive's interest after his employment.

Case 4:08-cv-00177-RWR    Document 11-2    Filed 04/24/2008    Page 7 of 11

The parties recognize that the severance payments provided for in subsection (i) of the first paragraph of this Section 3.5 of this Agreement (the "Non-Exempt Payments") are subject to Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and agree to work together in good faith to amend this Agreement if necessary to comply with Section 409A of the Code. If securities of *Partners* (or any corporation, trade or business that would be treated as a single employer with *Partners* under Sections 414(b) or (c) of the Code) are publicly traded on an established securities market on the Executive's Date of Termination (as defined below), and the Executive is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code as of such date, then no Non-Exempt Payment shall be made to the Executive before the earlier of (i) the date which is six months after the Executive's Date of Termination or (ii) the date of the Executive's death, and any Non-Exempt Payment that would otherwise have been made to the Executive under this Agreement during such period shall be accumulated without interest and paid to the Executive on the earlier of such dates. For purposes of this Section 3.5, "Date of Termination" shall mean the date of the Executive's "separation from service" (as defined in Section 409A of the Code).

## ARTICLE IV

### MISCELLANEOUS

Section 4.1    Assignment.    This Agreement and the rights and obligations of the Company hereunder may be assigned by the Company to any subsidiary of or successor to the Company, and shall inure to the benefit of, shall be binding upon, and shall be enforceable by any such assignee, *provided* that any such assignee shall agree in writing to assume and be bound by this Agreement and a copy of such writing is delivered to Executive at the time of such assignment, and the Company shall remain liable hereunder. This Agreement and the rights and obligations of Executive hereunder may not be assigned by Executive.

Section 4.2    Waiver.    This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties with respect to Executive's employment by the Company. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a waiver of waiver unless otherwise expressly provided. The Company, on the one hand, and Executive, on the other hand, may by written instrument only, (a) waive compliance with any of the covenants of the other party contained in this Agreement; and (b) waive the other party's performance of any of the obligations set out in this Agreement.

Section 4.3    Choice of Law.    This Agreement and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

Case 1:08-cv-00177-RWR   Document 11-2   Filed 04/24/2008

*Section 4.4   Notices.* Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered in person or by courier (effective when delivered), telegraphed, telexed or by facsimile transmission (effective when received) or mailed by certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged), as follows:

| | |
|---|---|
| If to the Company: | The Company's principal business address, to the Attention of the Managing Partner, which is presently:<br>Ball Street Ventures, LLC<br>1000 Wisconsin Ave., NW, Suite G-100<br>Washington, DC 20007<br>Attn: Managing Partner |
| If to Executive: | Last address of Executive known to Managing Partner, Presently:<br>32 Hitchcock Road<br>Westport, Connecticut, 06880 |

*Section 4.5   Counterparts.*   This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

*Section 4.6   Binding Effect.*   The rights and obligations of the parties under this Agreement shall inure to the benefit of and shall be binding upon the respective representatives, successors and assigns of the Company, *Partners,* and Executive.   The Company and *Partners* represent and warrant to Executive that they have all necessary power, right, capacity, and authority to execute this Agreement, to consummate the transactions contemplated herein, and to perform this Agreement and related transactions.

[SIGNATURE PAGE TO FOLLOW.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

COMPANY:

BALL STREET VENTURES, LLC

By: _____
    Brian K. Davis, Managing Partner

BALL STREET PARTNERS, LLC

By: _____
    Brian K. Davis, Managing Partner

EXECUTIVE:

_____  9/10/07
    Bryan H. Simms

**PROMISSORY NOTE**    August 29, 2007

In consideration of a loan from Lehman Brothers Inc. ("Lehman"), receipt of which is hereby acknowledged, the undersigned Bryan Simms (the "Borrower"), hereby promises to pay Lehman the principal sum of $742,857.16, with interest at the Firm's margin rate of interest, at its offices at 399 Park Ave, New York, New York, or to the order of Lehman. The Borrower hereby agrees to the following terms and conditions:

1.  Payment. The principal and interest shall be payable to Lehman through personal check or wire transfer on the following schedule:

    - September 10, 2008 - $297,142.86 (40% of the outstanding principal balance), plus accrued interest at the Firm's margin rate through the repayment date
    - September 10, 2009 – $445,714.30 (60% of the outstanding principal balance), plus accrued interest at the Firm's margin rate through the repayment date

    Interest at the Firm's margin rate of interest shall continue to accrue until the full amount of the outstanding loan, including accrued interest, is repaid to the Firm.

2.  Prepayment. The Borrower shall have the right at any time to prepay part or all of the unpaid principal, plus accrued interest through the date of payment, without penalty or premium.

3.  Indemnification. The Borrower further promises to pay and indemnify Lehman for all expenses incurred, including attorneys' fees, in connection with the collection of any amount due under this Note. The amount the Borrower may be liable for under this paragraph shall be the greater of the actual expenses incurred by Lehman or 15% of the unpaid balance of the Note at the time any proceedings are instituted for collection.

4.  Default. In the event of any default in payment under the terms of this Note for any reason whatsoever, the balance due hereunder will become immediately due and payable. The Borrower shall also be deemed to be in default hereunder if she is adjudicated bankrupt, makes an assignment for the benefit of creditors or files a petition for relief under the Bankruptcy Act.

5.  Waivers. The Borrower hereby waives presentment, demand for payment, notice of dishonor, protest and any and all other notices and demands in connection with the delivery, acceptance, performance, default or enforcement of this Note. No delay by the holder in exercising any power or right hereunder shall operate as a waiver of any power or right; nor shall any single or partial exercise of any power or right operate as such a waiver. No waiver or modification of the terms hereof shall be valid unless writing, signed by the holder of this Note and then only to the extent therein set forth.

6.  Deductions. Lehman shall have the right, without notice, to withhold from any amounts payable by Lehman to the undersigned, as salary, bonus, commissions, separation

payments, severance or otherwise, or to deduct monies from any security or commodity account the Borrower maintains with Lehman or from any amounts payable under any non-qualified deferred compensation, stock award or similar program or arrangement sponsored by Lehman or any of its affiliated companies, and to apply such withheld or deducted amounts to satisfy the indebtedness due under this Note. The Borrower hereby authorizes and consents to the aforementioned deductions.

7.   <u>Arbitration</u>. The undersigned hereby agrees that any controversy arising out of or relating to this Note, or default on this Note, shall be submitted to and settled by arbitration pursuant to the constitution, by-laws, rules and regulations of the New York Stock Exchange or the National Association of Securities Dealers.

8.   <u>Transferability</u>.  The Borrower may not transfer any part of this loan to any other individual or entity.

9.   <u>Governing Law</u>. This Note shall be governed by the substantive laws of the State of New York without regard to conflict of laws principles.

_____          _____
Date                                               Bryan Simms
                                                        SS# 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
                                                        P&L:  00306

STATE OF_____

COUNTY OF_____

SUBSCRIBED AND SWORN TO BEFORE ME ON_____2007.

                              _____
                              NOTARY PUBLIC

<u>**CERTIFICATE OF SERVICE**</u>

I, Jeffrey S. Jacobovitz, an attorney, on **April 24, 2008**, caused a true and correct copy of

*Defendants' Answer to Complaint and Counterclaims,* to be served upon the following via

CM/ECF and U.S. Mail:


Alisa H. Reff, Esq.
D.C. Bar No. 423113
1500 K Street, N.W.
Washington, D.C. 20005-1209
Tel:  (202) 842-8852
Fax:  (202) 842-8465
Email:  Alisa.Reff@dbr.com

Thomas J. Barton, Esq.
James G. Fannon, Esq.
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Tel:  (215) 988-2863
Fax:  (215) 988-2757
Email:  Thomas.Barton@dbr.com
Email:  James.Fannon@dbr.com


            /s/ Jeffrey S. Jacobovitz
              Jeffrey S. Jacobovitz