## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **BRYAN H. SIMMS** | : | |
| **32 Hitchcock Rd.** | : | |
| **Westport, CT 06880,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case:  1:08-cv-00177-RWR** |
| **v.** | : | **Hon. Richard W. Roberts** |
| | : | |
| **BALL STREET VENTURES, LLC** | : | |
| **1000 Wisconsin Ave., N.W., Suite G-100** | : | |
| **Washington, D.C. 20007;** | : | |
| | : | |
| **BALL STREET PARTNERS, LLC** | : | |
| **1000 Wisconsin Ave., N.W., Suite G-100** | : | |
| **Washington, D.C. 20007;** | : | |
| | : | |
| **BALL STREET FUND, LLC** | : | |
| **1000 Wisconsin Ave., N.W., Suite G-100** | : | |
| **Washington, D.C. 20007;** | : | |
| | : | |
| **CHRISTIAN LAETTNER** | : | |
| **1041 Ponte Verda Blvd.** | : | |
| **Ponte Verda Beach, FL 32082; and** | : | |
| | : | |
| **BRIAN K. DAVIS** | : | |
| **2230 Massachusetts Ave., N.W.** | : | |
| **Washington, D.C. 20008,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## DEFENDANTS' REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS

Defendants Ball Street Ventures, L.L.C. ("Ventures"), Ball Street Partners, L.L.C.

("Partners"), Ball Street Fund, L.L.C. ("Fund"), Brian K. Davis ("Davis"), and Christian Laettner

("Laettner"), through their attorneys, submit the following memorandum of law in further

support of their Motion to Dismiss Fund, Davis, and Laettner as parties to this action, and to Dismiss Counts II and III of Plaintiff's Complaint.

## INTRODUCTION

Plaintiff Bryan H. Simms ("Simms") alleges that his former employers, Ventures and Partners, have breached his Employment Agreement ("Agreement") by terminating his employment and through their subsequent actions.  In addition to his breach of contract claim, however, Simms attempts to allege additional claims against his former employers, including tortious breach of contract and breach of a covenant of good faith and fair dealing.  He also attempts to add allegations against parties who were never his employers – Davis, Laettner, and Fund – none of whom were parties to Simms' Agreement.  (Employment Agreement, attached hereto as Exhibit A ("Ex. A").)  The claims against these defendants must be dismissed.  His additional claims also cannot survive, as they are barred by Virginia law, which applies to all disputes arising from the Agreement.  (Ex. A, Section 4.3.)

Simms, however, seeks to disregard the terms of the Agreement he claims has been breached by Defendants, by arguing that District of Columbia law, not Virginia law, should apply to his contractual claims.  (Simms' Response Brief ("Resp."), p. 3-4.)  Simms, however, misapplies this District's choice of law analysis and, in any event, should not be permitted to evade those terms of the Agreement that he finds inconvenient while enforcing those allegedly to his benefit.

Simms also seeks to salvage his claims against Davis, Laettner, and Fund by arguing that they, along with Ventures and Partners, are in fact only one entity and should all therefore be held liable.  Simms' Complaint, however, makes no allegations suggesting that the required elements for piercing the corporate veil are present here.

## ARGUMENT

I.    **The Parties' Contractual Choice of Law Should Be Enforced, and Virginia Law Applied to Simms' Claims.**

Faced with the knowledge that Virginia law bars his claims in Counts II and III, Simms attempts to sidestep dismissal by claiming that the law of the District of Columbia should apply. Simms cites to and applies the District of Columbia's choice of law analysis, but neglects one key factor: the analysis he cites only applies where the parties have made no choice of law.[1] Here, the parties have clearly chosen the law that will apply – Virginia law – and thus the cited analysis is inapposite.  Counts II and III should be dismissed, as Virginia law bars those claims.

In diversity cases such as this one, federal courts within the District of Columbia look to the District of Columbia's precedent for the applicable choice of law provisions.  *See, e.g., Kroger v. Legalbill.com, LLC*, 436 F. Supp. 2d 97, 103 (D.D.C. 2006).  As a general rule, courts in the District of Columbia have held that when parties enter into a contract, they may specify the law that will govern that contract, so long as there is some reasonable relationship with the state specified.  *Id.* at 103; *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1394 (D.C. Cir. 1995) (noting that the ability to do so is part of the parties' freedom to contract); *Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980) (same).

Perhaps in recognition of the test that will actually apply to the choice of law question in this case, Simms argues that neither the parties nor the transaction at issue have any connection to Virginia.  (Resp., p. 4.)  This assertion is incorrect, as both Simms and his employers have a

---

[1] *Washkoviak v. Sallie Mae*, 900 A.2d 168 (D.C. 2006) and *Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143 (D.C. Cir. 1997) thus do not apply here, as the disputes in those cases involved no contractual choice of law.  Inexplicably, Simms also cites to a Maine case in support of his argument regarding the District of Columbia's choice of law analysis.  *Mitsubishi Caterpillar Forklift Amer., Inc. v. Superior Serv. Assoc., Inc.*, 81 F. Supp. 2d 101 (D. Me. 1999).  This case is also inapplicable to the present dispute.

number of connections to the state of Virginia.  When Simms was employed by Ventures and Partners, the entities were in the process of negotiating a significant real estate deal in Charlottesville, Virginia.  Simms was closely involved in those negotiations.  In addition, in his role as Chief Executive Officer, Simms selected corporate counsel for Ventures and Partners.  The firm he selected was McGuire Woods, with several locations in Virginia.  Further, both prior to and during his employment with Ventures and Partners, Simms was a member of the board of directors for the Darden Business School, University of Virginia.  As a member of the Board, Simms represented that he had strong connections in the Charlottesville area, which played a role in his eventual employment by Ventures and Partners.  Simms traveled to Virginia frequently, including on occasion to speak in his role as Chief Executive Officer of Ventures and Partners.  Simms, Ventures, and Partners have sufficient contacts with Virginia to make the contractual choice of law reasonable.

Simms entered into the Agreement, including the choice of law provision, after negotiations in which he was assisted by counsel.  In this action, he now seeks to enforce the purported terms of the Agreement and Defendants' alleged violations of those terms.  Fairness dictates that Simms not be permitted to attempt to enforce part of the Agreement, while invalidating the choice of law provision he agreed to.  *See, e.g., Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 144, 155 n.3 (D.D.C. 2008) (refusing to enforce contractual choice of law where plaintiff, who sought its enforcement, had disregarded the forum selection clause in the same agreement).  Virginia law was selected by the parties to the Agreement, including Simms, and should be applied to disputes arising from that Agreement.  Counts II and III of Simms' Complaint should be dismissed.

## II.    **Even if District of Columbia law applies, Counts II and III must still be dismissed.**

While Virginia law applies to Simms' contractual claims (as demonstrated above), even if District of Columbia law is held to apply, Counts II and III must still be dismissed for failure to state a claim.

### A.    **Tortious Breach of Contract**

In his attempt to state a claim under District of Columbia law for tortious breach of contract, Simms parrots the standard that defines the circumstances in which the rare award of punitive damages for breach of contract is appropriate, and summarily states that he has alleged facts that meet that standard. Plaintiff's attempt to salvage his claim is unavailing, and Count II of his Complaint should be dismissed.

Punitive damages are not favored in the law. *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982). Indeed, such damages are only awarded in breach of contract claims in the rare circumstances where the breach itself is so egregious that it rises to the level of a tort. *Wash. v. Gov't Employees Ins. Co.*, 769 F. Supp. 383, 388 (D.D.C. 1991); *Kahal v. J.W. Wilson & Assoc.*, 673 F.2d 547, 548 (D.C. Cir. 1982). An allegation that a breach of contract is "willful, wanton, or malicious" is not sufficient to show that the breach has reached the level of a tort so as to justify punitive damages. *Fireman's Fund Ins. Co. v. CTIA*, 480 F. Supp. 2d 7, 12 (D.D.C. 2007) ("Where the basis of a complaint is . . . a breach of contract, punitive damages will not lie, even if it is proved that the breach was willful, wanton, or malicious."); *Sere*, 443 A.2d at 37; *Wash.*, 769 F. Supp. at 388.

Simms attempts here to rely on just such allegations to support his claim for tortious breach of contract. Simms alleges that Defendants did not have "Cause" to terminate his employment. (Complaint, ¶19.) He also alleges that Defendants are withholding benefits to which he is allegedly entitled "in bad faith, vexatiously, wantonly, and for oppressive reasons."

(Complaint, ¶30.)  Even if true (which Defendants deny), Simms' allegations add up to nothing more than a claim that Defendants acted in bad faith – willfully, wantonly, maliciously.  Such allegations are insufficient to rise to the level of a tort, and Count II of Simms' Complaint should be dismissed.

### B.    Covenant of Good Faith and Fair Dealing

In a similar manner, Simms attempts to save his claim, under District of Columbia law, that Defendants have breached a covenant of good faith and fair dealing implied in his Employment Agreement.  However, Simms admits that no such cause of action exists when an employment relationship is at-will, and makes no allegations that would suggest that his employment by Ventures and Partners was anything else.  Count III of Simms' Complaint should also be dismissed.

Under District of Columbia law, and as Simms admits in his response brief (Resp., p. 6 n.3), no covenant of good faith and fair dealing is implied in an at-will employment contract. *See, e.g., Hoffman v. Hill and Knowlton, Inc.*, 777 F. Supp. 1003, 1006 n.3 (D.D.C. 1991) ("An implied covenant of good faith and fair dealing does not inhere in an at-will employment contract.").  To attempt to evade this clear statement of law, Simms attempts to argue that his employment relationship with Ventures and Partners was not at-will.  Simms, however, makes no allegations that would remove his employment relationship from the at-will realm.

All employment is presumed to be at-will, under District of Columbia law, unless the parties clearly express a contrary contractual intent.  *See Turner v. Fed. Express Corp.*, 539 F. Supp. 2d 404, 410 (D.D.C. 2008).  Such an intent is evidenced when the employment is "for a definite period, or that it was terminable *only* for cause."  *Morris v. Buvermo Properties, Inc.*, 510 F. Supp. 2d 112, 118 (D.D.C. 2007) (emphasis added); *Brug v. Nat'l Coalition for the*

*Homeless*, 45 F. Supp. 2d. 33, 44 (D.D.C. 1999). Simms makes no allegations in his Complaint that would lead to the conclusion that his employment by Ventures and Partners was for a definite period, nor that it was only terminable for cause.

In his response brief, Simms attempts to argue that because his Employment Agreement was only terminable "upon the satisfaction of specified conditions precedent," that he was not employed at-will. (Resp., p. 6 n.3.) Simms overstates the terms of his Agreement. Nothing in his Agreement prevented either Simms or Ventures and Partners from ending the employment relationship whenever they wished. The Agreement does provide that, under certain circumstances, Simms could potentially be entitled to additional compensation if his employment were terminated. (Ex. A, Section 3.3, "Termination".) These provisions included notice requirements, and the potential for severance pay. *Id.* But those provisions do not establish a definite time period for Simms' employment, nor do they provide that Simms' employment could *only* be terminated for cause. *See, e.g., Minihan v. Amer. Pharm. Assoc.*, 812 F.2d 726, 729 n.1 (D.C. Cir. 1987) (fact that employee was entitled to notice and severance pay if not terminated from cause did not render employment relationship other than at-will); *Gowens v. Dyncorp*, 132 F. Supp. 2d 38, 42 (D.D.C. 2001) (employment was at-will even where contract stated a term of 36 months, listed a number of reasons under which employee could be terminated for cause, and provided that employee could terminate employment relationship with two-week notice).

Simms' employment relationship with Defendants was an at-will relationship, and thus the termination of that employment cannot support a claim for breach of a covenant of good faith and fair dealing. Count III should be dismissed.

III.    **Simms' Complaint Fails to State Claims Against and Provide Fair Notice to Laettner, Davis and Fund.**

Simms's Complaint attempts to assert claims against Davis and Laettner in their individual capacities, and against Fund.  Simms argues that the corporate form can be disregarded in this case (Resp., p. 7-9), and that his Complaint provides Davis, Laettner, and Fund with fair notice of his claim that their alleged actions and/or omissions "warrant disregarding the corporate form."  (Resp., p. 7.)  However, despite having the burden to assert such allegations, nowhere in Simms' Complaint does he assert even the most cursory facts to support such a proposition.  His allegations are thus insufficient to provide Davis, Laettner, or Fund with fair notice of the claims against them, and his claims against those defendants should therefore be dismissed.

Courts reserve piercing the corporate veil for the rare circumstances in which an individual corporation abuses the corporate form or exerts undue influence over a corporate entity to accomplish an improper or unlawful purpose.  *Amore v. Accor N. Am., Inc.*, 529 F. Supp. 2d 85, 93 (D.D.C. 2008).  In the District of Columbia, "[a] party seeking to pierce the corporate veil must prove 'by affirmative evidence that [there is] (1) unity of ownership interest, and (2) use of the corporate form to perpetrate a fraud or wrong."  *Id., citing Ivanov v. Sunset Pools Mgmt. Inc.*, 524 F. Supp. 2d 13, 15 (D.D.C. 2007).

As an example, in *Amore*, because the veil piercing doctrine required a defendant to perpetrate a fraud through a corporate "sham" and because the plaintiff alleged no fraud, the court rejected the claim.  529 F. Supp. 2d at 93-94.  Similarly, Simms in no way makes allegations about the propriety or operation of Partners, or Ventures – and certainly not of Fund. Nor does he in any way make allegations that these entities operate as a "single business enterprise" or "are a collective façade for the personal activities of their owners, members David

and Laettner," as is asserted in Simms' response brief.  (Resp., p. 8.)  Simms's Complaint is utterly devoid of allegations that mention or reference the propriety of and need for "piercing the corporate veil" in this matter.

At the very least, Simms must plead that the corporations in question (Ventures and Partners) were so controlled and manipulated that they became a mere instrumentality of another, and that the corporate form is being used to perpetrate a fraud through a "corporate sham."  *See Amore* at 93*; see also Rehabcare Group E., Inc. v. Certified Health Mgmt., Inc.*, 07 C 2923, 2007 WL 3334500 at * 2-3 (N.D. Ill. Nov. 8, 2007) (attached hereto as Exhibit B).  Numerous courts have granted motions to dismiss because the party seeking to pierce the corporate veil failed to adequately plead the alter ego doctrine.  *Rehabcare Group E.,* 2007 WL 3334500 at *2. Conclusory pleadings are insufficient.  *Id.*

Simms has failed to meet the pleading standard required of him.  Simms has failed to provide a "short and plain statement of the claim" to give Laettner, Davis, and Fund fair notice of what his claim against them is, or the basis for that claim.  Fed. R. Civ. P. 8(a); *Major v. Plumbers Local Union No. 5*, 370 F. Supp. 2d 118, 123 (D.D.C. 2005).  What Simms has asserted are "vague and conclusory statements," which are insufficient under Federal pleading standards.  *See Hilska v. Jones*, 217 F.R.D. 16, 21 (D.D.C. 2003).  Further, Simms provides absolutely no statement as to exactly what his claim against Fund is or what it is based on. Simms's only allegation specifically referencing Fund (aside from general jurisdictional statement) (Complaint, ¶ 4), is his vague and conclusory statement that Fund was a joint employer, with Ventures and Partners, of Simms.  (Complaint, ¶ 5.)  This bare assertion comes despite Simms' contradictory allegations in paragraph 10 of his Complaint, stating that the Employment Agreement was with Ventures and Partners.  Fund was not even a party to the

employment agreement between Simms, Ventures, and Partners, by Simms' own admission. (*See* Ex. A; Complaint, ¶ 10.)

In defense of his argument that this Court should retain Davis, Laettner, and Fund as defendants and "pierce the corporate veil," Simms presents cases distinguishable from the facts of this case.  In *Lunayach v. Commc'ns Consultants, Inc. v. Zackiva Commc'ns Corp.*, No. 87-2296, 1988 WL 4245, *2 (D.D.C. Jan. 4, 1988) (attached hereto as Exhibit C), a case on which Simms heavily relies, the Complaint at issue clearly set forth allegations indicating the Plaintiff's belief that the corporate defendant "is the mere instrumentality and alter ego of Mr. Iscol" and that "corporate defendant operates as a sham and façade for the personal activities and affairs of Mr. Iscol."  The Court in that case acknowledged that the allegations were "cursory," but at the very least, the Defendant had asserted at least basic allegations that an individual (namely Mr. Iscol) dominated the organization so as to "negate the separate personality."  *Id.*  This is not so here.  Simms in no way presented specific allegations, however cursory, to lay the foundation for allegations that the "corporate veil" should be pierced or more importantly, that any one individual dominates Ventures, Partners or Fund, namely, Laettner and/or Davis.

Simms also failed to allege any of the basic elements that might support a piercing of the corporate veil, including, among other things, whether there was such a unity and interest in ownership that the separate personalities of the corporation and the individual no longer exist; the nature of the corporate ownership and control; failure to maintain adequate corporate formalities; commingling of funds and other assets of the corporation; and diversion of corporation's funds or assets to non-corporate uses such as the personal uses of the corporation's shareholders.  *See Labadie Coal Co. v. Black*, 672 F.2d 92, 96-99 (D.C. Cir. 1982); *see also Gonzalez v. Internacional De Elevadores, S.A.*, 891 A.2d 227, 237 (D.C. 2006) (holding that

Mexican company was not the alter ego of company that did business in the District for jurisdictional purposes and identifying various elements required to pierce the corporate veil). Simms' allegations do not even hint at these required elements, let alone provide sufficient notice to Defendants of an alter ego assertion.

Simms must at the very least "give [defendants] fair notice of what the . . . [plaintiff's] claim is and the *grounds* upon which it rests." *See Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1964 (2007) (emphasis added). "A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *See Rehabcare Group E., Inc.*, 2007 WL 3334500 at * 1 (citing *Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1964-65 (2007)). "Factual Allegations must be enough to raise a right to relief above the speculative level." *Id.* Here, because Simms fails to meet the federal pleading standard, Simms' Complaint, as to defendants Davis, Laettner, and Fund, should be dismissed.

Moreover, Plaintiff should not be permitted to amend his Complaint, as there is no good faith basis to do so. It is within court's discretion to deny leave to amend the complaint. *See Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977) (denying Plaintiff's motion for leave to amend complaint and holding that the decision to grant or deny leave to amend is vested in the sound discretion of the court).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss Ball Street Fund, L.L.C., Brian K. Davis, and Christian Laettner as parties to this action, dismiss Counts II and III of Plaintiff's Complaint with prejudice, and grant such other relief as the Court may consider just.

Dated:  May 12, 2008                          Respectfully submitted,

                                              By: /s/ Jeffrey S. Jacobovitz
                                              Jeffrey S. Jacobovitz, Esq.
                                              Schiff Hardin LLP
                                              D.C. Bar # 346569
                                              1666 K Street, N.W., Suite 300
                                              Washington, D.C. 20006
                                              Tel:  (202) 778-6400
                                              Fax:  (202) 778-6460
                                              Email:  jjacobovitz@schiffhardin.com

                                              *Attorney for Defendants Ball Street Ventures, L.L.C.
                                              Ball Street Partners, L.L.C., Ball Street Fund,
                                              L.L.C., Brian K. Davis, and Christian Laettner*

DC\7090528.2

Exhibit A

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into as of September __, 2007 between Ball Street Ventures LLC, a Delaware limited liability company (the "Company"), Ball Street Partners. LLC ("*Partners*"), and Bryan H. Simms, a resident of Connecticut ("Executive").

## BACKGROUND

The Company desires to employ Executive as Chief Executive Officer and Executive desires to accept employment with the Company on the terms and conditions set forth below. The parties acknowledge that Executive is resigning from his position as Senior Vice President with Lehman Brothers of New York to accept the Company's offer of employment set forth in this Agreement, and that as a consequence of Executive's termination of employment from Lehman Brothers, Executive will have an obligation to repay to Lehman a loan in the principal amount of $742,847.16, plus interest at Lehman's margin rate of interest. This loan would have been forgiven by Lehman Brothers had Executive continued in employment with Lehman Brothers.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

### TERMS OF ENGAGEMENT; DUTIES

*Section 1.1    Terms.*  The Company hereby employs Executive as Chief Executive Officer, and Executive hereby accepts employment by the Company subject to the terms and conditions hereof. The Effective Date of this Agreement is September 10, 2007. Executive shall report to the Managing Partner of the Company and shall perform such lawful duties as are reasonably related to his Chief Executive Officer duties described herein.

*Section 1.2    Duties.*  Throughout the term of this Agreement, Executive shall devote such portion of Executive's business effort, time, energy, and skill (reasonable vacations and reasonable absences due to illness excepted) as may be reasonably necessary to fulfill the duties of Chief Executive Officer of the Company.  Executive shall not be required to relocate his residence from his residence in Connecticut.

*Section 1.3    Employment with Grizzlies Acquisition Holdings and/or related Companies.*  The parties acknowledge and agree that, upon completion of purchase, Executive will also hold an executive position with Grizzlies Acquisition Holdings, or a related company, owning and operating the professional National Basketball Association franchise Memphis Grizzlies, at a salary of five hundred thousand dollars ($500,000.00) per year, and shall also receive a one percent (1%) interest in Grizzlies Acquisition Holdings and/or the related company.  The Company agrees and acknowledges that Executive will spend effort, time, and

energy in connection with Executive's duties for the Memphis Grizzlies during the Term of this Agreement. The Company agrees and acknowledges that Executive's efforts and time spent on Memphis Grizzlies matters during the term of this Agreement is not violation of this Agreement or in conflict with Executive's duties to the Company.

Section 1.4    *Orbit Holdings Obligations to Executive.*  Company acknowledges and agrees that Executive is entitled to a 5% finders fee from Orbit Holdings on amounts up to $115 million with respect to amounts to be invested in Orbit Holdings.  The parties acknowledge and agree that such payments by and obligations of Orbit Holdings to Executive are not in violation of or in conflict with Executive's duties to the Company.

## ARTICLE II

### COMPENSATION

In consideration of the services rendered by Executive pursuant to this Agreement, the Company shall pay or provide the following:

Section 2.1    *Base Salary.*  During the term of his employment hereunder, as of the Effective Date, Executive shall be paid a base salary of at least One Hundred Thousand Dollars ($100,000.00) per month (the "*Base Salary*"), which Base Salary will be reviewed by the President of the Company at least once each year and may be increased by the Company from time to time. The Base Salary shall be paid in accordance with the Company's standard payroll practices in effect from time to time. All payments to Executive hereunder shall be subject to such deductions and withholdings as are required by law or as authorized in writing by Executive to the extent permitted by law.

Section 2.2    *Benefits.*   The Company shall provide Executive medical, dental, disability, life insurance, and retirement benefits from the Company, and Executive shall participate in any executive or employee benefit plans, including but not limited to, any health, life, savings, pension, profit sharing, equity, or other benefit plans or practices in which other senior management employees of the Company participate.  In addition, the Company agrees to provide Executive with the use of an office and such support services, staff and supplies as are consistent with his duties and status as Executive Officer of the Company and his residence in Connecticut.

Section 2.3    *Business Expenses.*  The Company shall reimburse Executive or otherwise provide and pay for all reasonable business, travel and entertainment expenses incurred by Executive in furtherance of or in connection with the business of the Company, subject to compliance with the reasonable expense reimbursement policies established by the Company and in sufficient detail to comply with Internal Revenue Service Regulations. In addition, the Company shall reimburse Executive or otherwise provide and pay for all professional and business affiliation expenses incurred by Executive.

Section 2.4    *Executive's Equity Interest in Ball Street Partners, LLC.*   Upon the Effective Date of this Agreement, Executive shall immediately receive a fifteen percent (15%) equity interest in Ball Street Partners, LLC ("*Partners*").  Executive's equity interest in *Partners*

shall at all times (including without limitation, after termination of Executive's employment) be subject to (1) the right of *Partners*, in the event Executive elects to sell his interest in *Partners*, to purchase Executive's equity interest at *Fair Market Value* ("Right of First Refusal"); and also (2) a right by *Partners* to require Executive to sell his equity interest in *Partners* at no lower valuation than that received by the majority equity interest of *Partners* ("Right to Drag Along"). Executive (or Executive's Estate if applicable) shall have the right, in the event the majority equity interest of *Partners* is sold, to require *Partners* to purchase his equity interest in *Partners* at the same valuation received by the majority equity interest of *Partners* ("Right to Tag Along"). After termination by Company of Executive's Company employment for any reason, Executive (or Executive's Estate if applicable) shall have the right to require *Partners* to purchase his equity interest in *Partners* at *Fair Market Value*. *Fair Market Value* shall mean the valuation agreed upon by Executive (or Executive's Estate if applicable) and *Partners* under the circumstances; *provided,* that if Executive (or Executive's Estate if applicable) and *Partners* are not able to agree upon the valuation, Executive and *Partners* shall each appoint certified public accountants to represent them and determine the valuation. In the event the representative certified public accountants cannot agree upon the valuation, the representative certified public accountants shall together select a third certified public accountant who shall determine the *Fair Market Value* and whose determination shall be final and binding on all parties.

Section 2.5  *Signing Bonus.*  The parties agree and acknowledge that Executive's former employer, Lehman Brothers, will require Executive to repay to Lehman a note, attached hereto, in the amount of seven hundred forty-two thousand, eight hundred forty-seven dollars and sixteen cents ($742,847.16), plus interest at Lehman's margin rate of interest, and that this note would have been forgiven by Lehman Brothers had Executive continued in employment with Lehman Brothers. To the extent Executive is required to pay any amounts due under the Lehman Notes, Company agrees to accept joint and several liability with Executive to pay such amounts on behalf of Executive as they come due to discharge Executive's obligations under the Lehman Notes, to the extent such amounts come due during the course of Executive's employment with Company.

Section 2.6  *Grizzlies Holdings Compensation.*  The foregoing compensation from the Company shall be in addition to the annual salary of five hundred thousand dollars ($500,000.00) and the a one percent (1%) ownership interest that Executive shall receive from Grizzlies Acquisition Holdings and/or related companies, upon completion of that purchase.

## ARTICLE III

### TERM AND TERMINATION

Section 3.1  *Defined Terms.*  The following terms used herein shall have the definitions set forth below:

"*Cause*" means (i) conduct amounting to fraud or dishonesty against the Company or any subsidiary or affiliate of the Company; (ii) Executive's intentional misconduct, repeated refusal to follow the reasonable directions of the Managing Partner of the Company or material breach of this Agreement, *provided* the Managing Partner of the Company, upon the direction of the Partners, notifies Executive of the acts deemed to

Executive fails to correct such acts (or begin such action as may be necessary to correct such acts and thereafter diligently pursues the completion thereof) within five (5) business days after written notice has been given; or (iii) a conviction or plea of guilty or *nolo contendere* to a felony (other than one arising from the operation of a motor vehicle or resulting from actions taken (or not taken) by Executive in good faith in his capacity as an employee or officer of the Company).

*"Change in Control"* means (i) an acquisition of forty per cent (40%) or more of *Partners*, by a person who did not hold an ownership interest in *Partners* as of the Effective Date of this Agreement; (ii) a change in the Managing Partner of *Partners*; (iii) a merger or similar combination of Ball Street Ventures, LLC and/or *Partners* in which the current partners of *Partners* are not the controlling partners/owners of the surviving entity; or (iv) a sale of substantially all of the assets or liquidation of Ball Street Ventures, LLC or *Partners*. For purposes of this Agreement, the *Change in Control Effective Date* shall be the closing date of the sale or other disposition that accomplishes the *Change in Control*. For purposes of this Agreement, *Change in Control* does not apply to interests in *Partners* granted to employees of *Company* as part of their executive compensation.

*"Disability"* means (i) the inability of Executive to perform the duties of Executive's employment due to physical or emotional incapacity or illness, where such inability is reasonably expected to be of long-contained and indefinite duration (*i.e.*, for at least twelve (12) months); or (ii) Executive shall be entitled to (x) disability retirement benefits under the federal Social Security Act or (y) recover benefits under any long-term disability plan or policy maintained by the Company. In the event of a dispute, the determination of Disability shall be made reasonably by the Partners of the Company and shall be supported by advice of a physician competent in the area to which such Disability relates.

*"Effective Date"* means the date of this Agreement.

*"Good Reason"* means (i) any materially adverse change in the duties, responsibilities, total compensation and benefits package or status of the Executive to which he has objected in writing and the Company has not cured or taken reasonable steps to cure within thirty (30) days of receipt of such written objection; (ii) the assignment of Executive to a location outside of a fifty (50) mile radius from his current residence in Connecticut to which Executive has objected in writing to Company, and Company has not rescinded such assignment within thirty (30) days of receipt of such written objection; (iii) conduct on the part of the Company amounting to fraud or dishonesty against Executive; (iv) the Company's conviction or plea of guilty or *nolo contendere* to a felony; or (v) the occurrence of a *"Change in Control"* as defined herein, provided the Executive exercises his right to resign no later than six months after the *Change in Control Effective Date*, as defined above.

Section 3.2     The term of this Agreement and of Executive's employment hereunder shall commence on the Effective Date and shall continue until terminated as provided herein.

may be terminated:

        (a)      Upon the death or Disability of Executive;

        (b)      By the Company immediately for Cause;

        (c)      By the Company, without Cause, immediately upon giving Executive written notice;

        (d)      By Executive immediately for Good Reason;

        (e)      By mutual agreement between Executive and the Company; or

        (f)      By Executive upon forty-five (45) days' advanced written notice, during which time Executive shall continue to perform his duties hereunder.

*Section 3.4    Remuneration.*  Except as otherwise specified herein, upon termination of Executive's employment hereunder pursuant to this Article IV, the Company shall have no further obligation to Executive or Executive's estate or personal representative in the case of death with respect to remuneration due under this Agreement, except for salary and vacation pay, earned but unpaid at the date of termination, and such amounts, if any, due Executive under Section 2 hereof but unpaid as of the date of termination.

*Section 3.5    Severance Payments.*  Upon termination of Executive's employment hereunder pursuant to Section 3.3(c) or 3.3(d), the Company shall pay to Executive, as severance pay hereunder, (i) an amount equal to twelve (12) months of his then-current salary in effect at the time of termination paid in six equal payments over the first six months following his Date of Termination (as defined below); (ii) COBRA premiums to provide continued medical coverage at Company expense for Executive and his family throughout the COBRA period; and (iii) a $15,000.00 allowance for outplacement services for Executive due on the first day of the month following termination.

Upon termination of Executive's employment pursuant to Section 3.3(a), this Agreement shall terminate and no further salary, benefits or compensation of any type shall be payable to the Executive after the date of termination, except that the Executive or the Executive's estate, heirs or beneficiaries, as applicable, shall be entitled to any benefits specifically provided to them or the Executive under any benefit plan, and all compensation earned but not yet paid.

Upon termination of Executive's employment pursuant to Section 3.3(b) or 3.3(e) or 3.3(f), this Agreement shall terminate and no further salary, benefits or compensation of any type other than amounts due under Section 2 but not yet paid as of the date of termination, shall be paid to the Executive under the terms of this Agreement after the date of termination, except the Executive shall retain the right to participate in benefit plans under Section 2.3 subject to the terms of those plans and applicable federal and state law.

Executive's equity interest in Partners shall not be forfeited by termination of his employment for any reason, and the rights of the parties as provided in Section 2.5, including

The parties recognize that the severance payments provided for in subsection (i) of the first paragraph of this Section 3.5 of this Agreement (the "Non-Exempt Payments") are subject to Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and agree to work together in good faith to amend this Agreement if necessary to comply with Section 409A of the Code. If securities of *Partners* (or any corporation, trade or business that would be treated as a single employer with *Partners* under Sections 414(b) or (c) of the Code) are publicly traded on an established securities market on the Executive's Date of Termination (as defined below), and the Executive is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code as of such date, then no Non-Exempt Payment shall be made to the Executive before the earlier of (i) the date which is six months after the Executive's Date of Termination or (ii) the date of the Executive's death, and any Non-Exempt Payment that would otherwise have been made to the Executive under this Agreement during such period shall be accumulated without interest and paid to the Executive on the earlier of such dates. For purposes of this Section 3.5, "Date of Termination" shall mean the date of the Executive's "separation from service" (as defined in Section 409A of the Code).

## ARTICLE IV

### MISCELLANEOUS

Section 4.1    *Assignment*.   This Agreement and the rights and obligations of the Company hereunder may be assigned by the Company to any subsidiary of or successor to the Company, and shall inure to the benefit of, shall be binding upon, and shall be enforceable by any such assignee, *provided* that any such assignee shall agree in writing to assume and be bound by this Agreement and a copy of such writing is delivered to Executive at the time of such assignment, and the Company shall remain liable hereunder. This Agreement and the rights and obligations of Executive hereunder may not be assigned by Executive.

Section 4.2    *Waiver*. This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties with respect to Executive's employment by the Company. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a waiver of waiver unless otherwise expressly provided. The Company, on the one hand, and Executive, on the other hand, may by written instrument only, (a) waive compliance with any of the covenants of the other party contained in this Agreement; and (b) waive the other party's performance of any of the obligations set out in this Agreement.

Section 4.3    *Choice of Law*.  This Agreement and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

**Section 4.4  Notice.**  Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered in person or by courier (effective when delivered), telegraphed, telexed or by facsimile transmission (effective when received) or mailed by certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged), as follows:

| | |
|---|---|
| If to the Company: | The Company's principal business address, to the Attention of the Managing Partner, which is presently:<br>Ball Street Ventures, LLC<br>1000 Wisconsin Ave., NW, Suite G-100<br>Washington, DC  20007<br>Attn: Managing Partner |
| If to Executive: | Last address of Executive known to Managing Partner, Presently:<br>32 Hitchcock Road<br>Westport, Connecticut, 06880 |

**Section 4.5  Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

**Section 4.6  Binding Effect.**  The rights and obligations of the parties under this Agreement shall inure to the benefit of and shall be binding upon the respective representatives, successors and assigns of the Company, *Partners,* and Executive.  The Company and *Partners* represent and warrant to Executive that they have all necessary power, right, capacity, and authority to execute this Agreement, to consummate the transactions contemplated herein, and to perform this Agreement and related transactions.

[SIGNATURE PAGE TO FOLLOW.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

COMPANY:

BALL STREET VENTURES, LLC

By: _____
      Brian K. Davis, Managing Partner

BALL STREET PARTNERS, LLC

By: _____
      Brian K. Davis, Managing Partner

EXECUTIVE:

_____ 9/10/07
      Bryan H. Simms

**PROMISSORY NOTE**

August 29, 2007

  In consideration of a loan from Lehman Brothers Inc. ("Lehman"), receipt of which is hereby acknowledged, the undersigned Bryan Simms (the "Borrower"), hereby promises to pay Lehman the principal sum of $742,857.16, with interest at the Firm's margin rate of interest, at its offices at 399 Park Ave, New York, New York, or to the order of Lehman. The Borrower hereby agrees to the following terms and conditions:

1. <u>Payment</u>.  The principal and interest shall be payable to Lehman through personal check or wire transfer on the following schedule:

  ▪ September 10, 2008 - $297,142.86 (40% of the outstanding principal balance), plus accrued interest at the Firm's margin rate through the repayment date
  ▪ September 10, 2009 – $445,714.30 (60% of the outstanding principal balance), plus accrued interest at the Firm's margin rate through the repayment date

  Interest at the Firm's margin rate of interest shall continue to accrue until the full amount of the outstanding loan, including accrued interest, is repaid to the Firm.

2. <u>Prepayment</u>.  The Borrower shall have the right at any time to prepay part or all of the unpaid principal, plus accrued interest through the date of payment, without penalty or premium.

3. <u>Indemnification</u>.  The Borrower further promises to pay and indemnify Lehman for all expenses incurred, including attorneys' fees, in connection with the collection of any amount due under this Note.  The amount the Borrower may be liable for under this paragraph shall be the greater of the actual expenses incurred by Lehman or 15% of the unpaid balance of the Note at the time any proceedings are instituted for collection.

4. <u>Default</u>.  In the event of any default in payment under the terms of this Note for any reason whatsoever, the balance due hereunder will become immediately due and payable. The Borrower shall also be deemed to be in default hereunder if she is adjudicated bankrupt, makes an assignment for the benefit of creditors or files a petition for relief under the Bankruptcy Act.

5. <u>Waivers</u>.  The Borrower hereby waives presentment, demand for payment, notice of dishonor, protest and any and all other notices and demands in connection with the delivery, acceptance, performance, default or enforcement of this Note.  No delay by the holder in exercising any power or right hereunder shall operate as a waiver of any power or right; nor shall any single or partial exercise of any power or right operate as such a waiver.  No waiver or modification of the terms hereof shall be valid unless writing, signed by the holder of this Note and then only to the extent therein set forth.

6. <u>Deductions</u>.  Lehman shall have the right, without notice, to withhold from any amounts payable by Lehman to the undersigned, as salary, bonus, commissions, separation

payments, severance or otherwise, or to deduct monies from any security or commodity account the Borrower maintains with Lehman or from any amounts payable under any non-qualified deferred compensation, stock award or similar program or arrangement sponsored by Lehman or any of its affiliated companies, and to apply such withheld or deducted amounts to satisfy the indebtedness due under this Note. The Borrower hereby authorizes and consents to the aforementioned deductions.

7.  <u>Arbitration</u>.  The undersigned hereby agrees that any controversy arising out of or relating to this Note, or default on this Note, shall be submitted to and settled by arbitration pursuant to the constitution, by-laws, rules and regulations of the New York Stock Exchange or the National Association of Securities Dealers.

8.  <u>Transferability</u>.  The Borrower may not transfer any part of this loan to any other individual or entity.

9.  <u>Governing Law</u>.  This Note shall be governed by the substantive laws of the State of New York without regard to conflict of laws principles.

_____
Date

_____
Bryan Simms
SS#
P&L: 00306

STATE OF_____

COUNTY OF_____

SUBSCRIBED AND SWORN TO BEFORE ME ON_____2007.

_____
NOTARY PUBLIC

Exhibit B

*Westlaw.*

Slip Copy                                                                                                                Page 1
Slip Copy, 2007 WL 3334500 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 3334500)**

CRehabCare Group East, Inc. v. Certified Health Management, Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
REHABCARE GROUP EAST, INC. d/b/a Rehabcare Group Therapy Services, Inc., Plaintiff,
v.
CERTIFIED HEALTH MANAGEMENT, INC., et al., Defendants.
**No. 07 C 2923.**

Nov. 8, 2007.

Adam K. Hollander, Alan J. Martin, Jaime L. Stilson, Mayer Brown LLP, Chicago, IL, Phillip A. Martin, Fultz, Mfaddox, Hovious & Dickens PLC, Louisville, KY, for Plaintiff.
Matthew Thomas Gensburg, Tanisha Renae Jones, Greenberg Traurig, LLP, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

JAMES B. ZAGEL, United States District Judge.

## I. INTRODUCTION

**\*1** Plaintiff RehabCare Group East, Inc. ("plaintiff" or "rehabcare") Brings This six-count complaint against Certified Health Management, Inc. ("Defendant" or "CHM"), an entity that manages skilled nursing homes. While the motion to dismiss before me now only involves CHM, Plaintiff also brings its complaint against seven facilities that CHM manages ("Facilities"). At bottom, this is a contract dispute. The nub of Plaintiff's complaint is its allegation that Defendant and the Facilities failed to pay RehabCare for the therapy services RehabCare provided. For the reasons stated below, CHM's motion is granted in part and denied in part.

## II. DISCUSSION

### A. Motion to Dismiss Standard

A motion to dismiss tests the sufficiency of a complaint, not the merits of a case. *Autry v. Northwest Premium Servs., Inc.,* 144 F.3d 1037, 1039 (7Th Cir.1998). I must accept all well-pleaded factual allegations in the complaint as true, drawing all reasonable inferences from those facts in Plaintiff's favor. *Cleveland v. Rotman,* 297 F.3d 569, 571 (7th Cir.2002). I may grant the motion only if "no relief could be granted under any set of facts that could be proved consistent with the allegations."*Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). That said, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level."*Bell Atlantic Corp. v. Twombly,* --- U.S. ----, --- -- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (internal citations and quotations omitted). As the Seventh Circuit noted, "it is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief."*EEOC v. Concentra Health Services, Inc.,* 496 F.3d 773, 496 F.3d 773, 777 (7th Cir.2007) (emphasis in original). While the Supreme Court's recent decision in *Bell Atlantic* may not have changed the federal pleading standard to a fact-pleading regime, "at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled."*Airborne Beepers & Video, Inc. v. AT & T Mobility LLC,* --- F.3d ----, No. 06-2949, 499 F.3d 663, 2007 WL 2406859, at \*4 (7th Cir.2007).

### B. Counts I, IV, and V-Breach of Contract, Account Stated, and Attorneys' Fees

In Count I, RehabCare alleges a breach of contract claim, Count IV alleges an "account stated" claim, and Count V seeks attorneys' fees. CHM's motion to dismiss these claims is premised on the simple fact that it is not a party to any contract with Plaintiff. RehabCare concedes this, but argues that its claims against CHM are valid under the "alter ego" theory. That is, it seeks to argue that CHM is so intertwined with the Facilities that CHM should be held

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3334500 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 3334500)**

Page 2

responsible for the Facilities' obligations. RehabCare seeks to do this despite the "well-established principle that a corporation is separate and distinct as a legal entity from its shareholders, directors, and officers, and generally, from other corporations with which it may be affiliated."*Innkeepers' Telemanagement & Equip. Corp. v. Hummert Management Group, Inc., 841 F.Supp. 241, 245 (N.D.Ill.1993)* (citation omitted).

**\*2** In order to employ the "alter ego" theory, RehabCare must "pierce the corporate veil." Under Illinois law,[FN1] courts will pierce the corporate veil where: (1) "the corporation was so controlled and manipulated that it had become a mere instrumentality of another" and (2) "recognition of a separate corporate identity would sanction a fraud or promote injustice."*Chicago Florsheim Shoe S. v. Cluett, Peabody & Co., 826 F.2d 725, 728 (7th Cir.1987).* Parties seeking to pierce the corporate veil face a daunting hurdle. *See Pederson v. Paragon Pool Enterprises, 214 Ill.App.3d 815, 158 Ill.Dec. 371, 574 N.E.2d 165, 167 (Ill.Ap.Ct.1991)* ("Piercing [the] corporate veil is a task which courts should undertake reluctantly."); *see also Hornsby v. Hornsby's Stores, Inc., 734 F.Supp. 302, 307-08 (N.D.Ill.1990)* (explaining that exceptions to the rule providing that corporations have separate identities are "not favored and are stringently applied"). The task is even more difficult in a breach of contract case. *See Main Bank of Chicago v. Baker, 86 Ill.2d 188, 56 Ill.Dec. 14, 427 N.E.2d 94, 101 (Ill.1981)* (holding that in a breach of contract case, "additional compelling facts," such as a finding of fraud, may also be required in order to pierce the corporate veil). Nevertheless, the question here is not whether Plaintiff can necessarily pierce the corporate veil, but whether its claim can survive a motion to dismiss, a much lower threshold. *Cf., Ermoian v. LaSalle Capital L.L.C., No. 07 C 1314, 2007 WL 1752206, at \*1 (N.D.Ill. June 15, 2007)* (declining to grant individual defendants' motion to dismiss "with the understanding that their present retention in the case is limited to the potential of their liability on corporate-veil-piercing or alter-ego grounds").

FN1. Both parties agree that Illinois law applies here.

Despite the lower threshold in this procedural posture, Plaintiff nevertheless fails to sufficiently plead its breach of contract or account stated claims under the alter ego theory. As noted, Plaintiff must establish two facts in order to pierce the corporate veil. Plaintiff fails adequately to plead either one. For the first requirement, Plaintiff must plead that the Facilities were so controlled and manipulated that they had become mere instrumentalities of CHM. Plaintiff's attempt to do so comes in the form of its allegation that "upon information and belief, Defendants operate without respect for corporate formalities and in a manner that is inconsistent with their being separate and legal entities."This is insufficient, even under the liberal pleading requirements of *FED.R.CIV.P. 8.*

Numerous courts have granted motions to dismiss because the party seeking to pierce the corporate veil failed to adequately plead the alter ego doctrine.*In Classic Fire & Marine Ins. Co. v. Illinois Ins. Exchange., No. 97 C 1256, 1997 WL 767290 (N.D.Ill.Dec.3, 1997),* the plaintiff asserted that two entities were "affiliate members of the same corporate group, and are subject to common control and ownership."The court deemed the plaintiff's "conclusory" pleading to be insufficient vis-a-vis the first requirement. *Id.* at \*5;*see also Hornsby, 734 F.Supp. at 307-08* (mere allegation that corporations shared office space, office staff and directors is insufficient to suggest fraud or injustice or that one corporation was the alter ego of another); *Club Assistance Program, Inc. v. Zukerman, 594 F.Supp. 341, 351 (N.D.Ill.1984).*

**\*3** The court in *Trustees of Cement Masons Fund, Local 502 v. F & V Cement Contractors, No. 02 C 3979, 2004 WL 765368, at \*3 (N.D.Ill. April 7, 2004),* also determined that a plaintiff failed to sufficiently plead the alter ego doctrine. There, the plaintiff pled that one entity "controlled the actions of [another entity] and was at all times aware of the wrongful conduct of the company."*F & v. Cement Contractors, 2004 WL 765368, at \*3.* The court held that averment to be "the kind of barebones, conclusory allegation that has been found insufficient to state an alter ego claim even under the liberal notice pleading requirements of *Federal Rule of Civil Procedure 8(a)."Id.; see also Strojmaterialintorg v. Russian Am. Commercial Corp., 815 F.Supp. 103, 105 (E.D.N.Y.1993)* (holding that conclusory allegations regarding the exercise of dominion and control are insufficient when attempting to plead the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alter ego doctrine).

Like in *Classic Fire & Marine Ins. Co.* and *F & v. Cement Contractors,* Plaintiff's attempt to satisfy the first requirement of the alter ego doctrine is insufficient to withstand a motion to dismiss. RehabCare's allegation-that "upon information and belief, Defendants operate without respect for corporate formalities and in a manner that is inconsistent with their being separate and legal entities-is precisely the type of formulaic, skeletal conclusion that were found lacking in *Classic Fire & Marine Ins. Co.* and *F & v. Cement Contractors.* Furthermore, even if I were to deem this sufficient for the first requirement, Plaintiff's complaint does not even allege that the second requirement has been satisfied.

As against CHM, Counts I, IV, and V of Plaintiff's complaint are premised upon the alter ego doctrine. Because Plaintiff fails to satisfactorily plead that theory here, Defendant's motion to dismiss Counts I, IV and V (as against CHM) is granted.

*C. Count II-Promissory Estoppel*

In Count II, Plaintiff asserts a claim for promissory estoppel. "To plead a cause of action for promissory estoppel, plaintiff must allege that (1) defendants made an unambiguous promise to plaintiff; (2) plaintiff relied on this promise; (3) plaintiff's reliance was expected and foreseeable by defendants; and (4) plaintiff relied to his detriment." *Robinson v. BDO Seidman, LLP,* 367 Ill.App.3d 366, 305 Ill.Dec. 175, 854 N.E.2d 767, 773 (Ill.App.Ct.2006) (quoting *Jago v. Miller Fluid Power Corp.,* 245 Ill.App.3d 876, 185 Ill.Dec. 785, 615 N.E.2d 80 (Ill.App.Ct.1993)).

Defendant's first line of attack on this Count argues that promissory estoppel is no longer recognized as an offensive cause of action in Illinois. To be sure, some intermediate courts of appeal in Illinois have held that promissory estoppel can no longer be pled as a cause of action, but rather only as an affirmative defense. *See, e.g., Dewitt v. Fleming,* 357 Ill.App.3d 571, 293 Ill.Dec. 446, 828 N.E.2d 756 (Ill.App.Ct.2005); *ESM Dev. Corp. v. Dawson,* 342 Ill.App.3d 688, 277 Ill.Dec. 30, 795 N.E.2d 397, 403 (Ill.App.Ct.2003). However, the Illinois Supreme Court's most recent statement on promissory estoppel was not definitive on this question. *See Quake*

*Constr., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990 (Ill.1990). Moreover, there is disagreement amongst the Illinois courts as to whether *Dewitt* and *ESM* reflect the position of the Illinois Supreme Court. *See, e.g., Chatham Surgicore, Ltd. v. Health Care Serv. Corp.,* M826 N.E.2d 970, 975 (Ill.App.Ct.2005) (citing *Quake* and holding that plaintiff stated an affirmative claim for promissory estoppel). Several courts sitting in diversity in this district have declined to adopt the "novel" theory that promissory estoppel can no longer be pled as an offensive cause of action in Illinois. *See Kamboj v. Eli Lilly & Co.,* No. 05 C 4023, 2007 WL 178434, at *10 (N.D.Ill. January 18, 2007); *TNT Logistics North America, Inc. v. Bailly Ridge TNT, LLC,* No. 05 C 7219, 2006 WL 2726224, at *10 (N.D.Ill. September 21, 2006); *LM Insurance Corp. v. Sourceone Group, Inc.,* 454 F.Supp.2d 727, 741 (N.D.Ill.2006)("*Quake*... still stands as the governing law in Illinois concerning promissory estoppel."). I agree with the other judges on this Court; while exercising diversity jurisdiction, I am unwilling to adopt the position of the Dewitt and ESM courts absent a more definite statement from the Supreme Court of Illinois.

**\*4** Plaintiff sufficiently pleads the elements of a promissory estoppel claim. RehabCare claims that CHM promised to pay for Plaintiff's services. Plaintiff further claims that it relied on this promise and continued providing services. Plaintiff asserts that its reliance was reasonable, and lastly, it states that its reliance resulted in damages.

The fact that Plaintiff has overcome the low hurdle of the lax federal pleading standards obviously does not necessarily mean that it will be able to recover on this theory. CHM cites to both *Dumas v. Infinity Broadcasting Corp.,* 416 F.3d 671 (7th Cir.2005) and *Kamboj,* both of which may ultimately frustrate RehabCare's efforts to prevail. Nevertheless, the *Kamboj* court disposed of the plaintiff's claim on summary judgment. 2007 WL 178434, at *10. Similarly, the Seventh Circuit in *Dumas* was reviewing a district court's grant of summary judgment. 416 F.3d at 672. Because the procedural posture is different here, those authorities fail to counsel in favor of the result CHM seeks. Defendant's motion to dismiss Count II is denied.

*D. Count III-Unjust Enrichment*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In Count III, Plaintiff seeks recovery based on the theory of unjust enrichment. To state a cause of action based on a theory of unjust enrichment, RehabCare must allege that CHM "has unjustly retained a benefit to [RehabCare's] detriment, and that [CHM's] retention of the benefit violates the fundamental principles of justice, equity, and good conscience."*HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (Ill.1989). Plaintiff's unjust enrichment claim is non-traditional in the same way as the plaintiff's claim in *HPI* was. Here, as there, Plaintiff "is seeking recovery of a benefit that was transferred to the defendant by a third party" as opposed to a benefit that Plaintiff itself transferred. *Id.* In this case, RehabCare seeks to recover any funds that CHM may have received from the federal government via the Medicare program.

In a situations like this, where an unjust enrichment claim is based on a benefit transferred from a third party to the defendant, Plaintiff must establish one of three propositions in order to recover. Plaintiff must establish either that:

(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant.

*Id.* (internal citations omitted). In this case, Plaintiff relies on the third option and argues that it had a better claim than CHM to the Medicare funds. The parties engage in a minor dust-up concerning materials RehabCare attached to its response brief about the Medicare payments. I need not consider these exhibits at this stage, and in fact, I did not consider them. The allegations in the complaint put CHM on notice of the substance of RehabCare's unjust enrichment claim. Whether RehabCare will ultimately be able to prevail on this claim is a question for another day. Consequently, the motion to dismiss Count III is denied.

*E. Count VI-Tortious Interference with Contract*

**\*5** In Count VI, RehabCare alleges tortious interference with contract (also referred to as intentional interference with contract rights. In Illinois, the elements of this tort are:

(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

*HPI,* 137 Ill.Dec. 19, 545 N.E.2d at 672 (*citing Prudential Ins. Co. v. Van Matre,* 158 Ill.App.3d 298, 110 Ill.Dec. 563, 511 N.E.2d 740 (Ill.App.Ct.1987).

RehabCare adequately pleads all of these elements. However, this does not end the inquiry. The *HPI* court, in a factually analogous situation, noted that "where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious."*Id.* at 677.The *HPI* court went on to state hospital management companies enjoy a privilege with regard to the entities they manage. *Id.* ("[T]he duty owed by hospital management companies to their hospitals should take precedence over their duty to the hospitals' contract creditors."). Based on the sound reasoning in *HPI,* I find that CHM-like the defendant in *HPI*-enjoys at least some privilege with regard to the Facilities.

The fact that CHN enjoys the privilege is not, in and of itself, dispositive though. The existence of the privilege means only that in addition to the above-listed elements, RehabCare must *also* allege that CHM acted in a malicious or unjustified manner. *See HPI,* 137 Ill.Dec. 19, 545 N.E.2d at 677 ("[W]here the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious.").

CHM argues, based on *HPI,* that I should dismiss Count VI because RehabCare failed to make these additional allegations that are required as a result of the privilege. However, RehabCare's failure to sufficiently allege that CHM's conduct was unjustified may not be fatal. That is because the *HPI* court also pointed out that "[a] defendant who is protected by a privilege ... is not justified in engaging

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3334500 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 3334500)**

in conduct which is totally unrelated or even antagonistic to the interest which gave rise to defendant's privilege." *Id.* at 678. As an example, the court stated that

a hospital management company, whose privilege is based upon the management company's role in exercising business judgment on behalf of the company's hospital, would not be justified in inducing a breach of contract *solely for the management company's gain...* since such conduct would not have been done to further the hospital's interests.

*Id.* So while RehabCare does not sufficiently allege malice, it may nevertheless be able to prevail if it can establish that CHM was acting solely for its own gain, as opposed to on behalf of the Facilities. It is this possibility that rescues Count VI of Plaintiff's complaint.

## V. *CONCLUSION*

**\*6** For the aforementioned reasons, CHM's motion to dismiss is granted as to Counts I, IV and V and denied as to Counts II, III, and VI.

N.D.Ill.,2007.
RehabCare Group East, Inc. v. Certified Health Management, Inc.
Slip Copy, 2007 WL 3334500 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C

Westlaw.

Not Reported in F.Supp.                                          Page 1
Not Reported in F.Supp., 1988 WL 4245 (D.D.C.)
**(Cite as: Not Reported in F.Supp., 1988 WL 4245)**

▷Lunayach Communications Consultants, Inc. v.
Zackiva Communications, Corp.
D.D.C., 1988.
Only the Westlaw citation is currently available.
 United States District Court, District of Columbia.
   LUNAYACH COMMUNICATIONS
   CONSULTANTS, INC., Plaintiffs,
                  v.
   ZACKIVA COMMUNICATIONS
 CORPORATION, et al. Defendants.
           **Civ. A. No. 87-2296.**

             January 4, 1988.

          MEMORANDUM ORDER

JOHN H. PRATT, District Judge.
**\*1** Plaintiff Lunayach Communications Consultants,
Inc. brings this breach of contract action against
defendants Ken Iscol and Zackiva Communications
Corporation. Presently before us are defendants'
motion to dismiss, or in the alternative, defendants'
motions for a more definite statement pursuant to
Fed. R. Civ. P. 12(e), and transfer pursuant to 28
U.S.C. § 1404(a) (1982). Upon careful consideration
of the briefs submitted by the parties, and the record
as a whole, we find defendants' several motions to be
without merit and deny them for the reasons stated
below.

             DISCUSSION

I. Defendants' Motion to Dismiss

A. Failure to State a Claim

Defendants move to dismiss this action pursuant to
Fed. R. Civ. P. 12(b)(6) for failure to state a claim
upon which relief can be granted. Specifically,
defendants assert that plaintiff has failed to allege in
its complaint that Lunayach personally performed the
contract in question. This, they claim, is a
precondition to their obligation to pay for the services
rendered under the terms of the contract. Thus,
defendants argue that plaintiff has failed to allege the
elements of a valid cause of action.

We turn first to the guiding principles used in
determining whether a motion to dismiss for failure
to state a claim should be granted. It is well settled
that, for purposes of a Fed. R. Civ. P. 12(b)(6)
motion, the factual allegations of the complaint must
be taken as true and any ambiguities resolved in favor
of the pleader.See Scheuer v. Rhodes, 416 U.S. 232,
236 (1974); Doe v. Department of Justice, 753 F.2d
1092, 1102 (D.C. Cir. 1985). In addition, the
complaint must be liberally construed in favor of the
plaintiff.Fed. R. Civ. P. 8(b); Jenkins v. McKeithen,
395 U.S. 411, 421 (1969); Schuler v. United States,
617 F.2d 605, 608 (D.C. Cir. 1979). Thus, a
complaint is not properly dismissed 'unless it appears
beyond doubt that plaintiff can prove no set of facts
in support of [its] claim which would entitle [it] to
relief.'Conley v. Gibson, 355 U.S. 41, 45-46 (1957);
Gray v. Bell, 712 F.2d 490, 493 n.2 (D.C. Cir. 1983),
cert. denied465 U.S. 1100.See also U.S. Ex. Rel.
Joseph v. Cannon, 642 F.2d 1373, 1378 (D.C. Cir.
1981), cert. denied455 U.S. 999 (1982). Finally, the
complaint is not to be dismissed unless the court
determines that the allegations set forth in it fail to
support relief on any legal theory.D.C. v. Air Florida,
750 F.2d 1077 (D.C. Cir. 1984).

Applying these principles to the issue at hand, we
find that plaintiff's complaint does state a claim for
relief. First, plaintiff's complaint very clearly alleges
facts which, if proven, could establish an implied
contract or quantum meruit claim. Thus, even
assuming that plaintiff's complaint does not state a
cause of action for recovery under the contract, we
can not say that 'plaintiff can prove no set of facts in
support of their claim for relief.'This is particularly
true when, as best we can determine from the
pleadings, defendants have accepted the benefits of
the arrangement, however it be described, and have
declined to pay for such benefits.FN1 Second, we find
that in this early stage of the litigation, plaintiff need
not allege the occurrence of an alleged precondition
to recovery, where the allegations set forth a
reasonable construction of the contract.See Lyons v.
Liberty National Bank, 65 F.2d 837 (D.C. Cir. 1933).

In its complaint plaintiff alleges the existence of a
contract, performance and breach. Specifically,
plaintiff alleges that a contract exists between itself

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1988 WL 4245 (D.D.C.)
**(Cite as: Not Reported in F.Supp., 1988 WL 4245)**

and Zackiva; that pursuant to the agreement Zackiva promised to pay Lunayach for specified engineering exhibits and forms supplied, provided that Zackiva received certain cellular telephone licences; that Lunaych provided the forms and exhibits and that Zackiva did in fact receive several licenses. Plaintiff alleges that '[e]very condition precedent to the obligation of the corporate defendants to pay for the engineering exhibits and forms of Lunayach has occurred.'Complaint ¶24.See also ¶26. Defendants, as noted, dispute this.

**\*2** This is a question of contract interpretation.FN2 We cannot say, as defendants vigorously assert, that 'the express, undisputed language of Section 10 of the Agreement' required Lunayach, and only Lunayach, to prepare the exhibits and forms contracted for. Despite defendants' assertions to the contrary, the language identified is ambiguous, and plaintiff offers a reasonable interpretation of the contract in its complaint. Although we refrain from interpreting the meaning of the contract at this early stage, we find that the facts alleged by plaintiff as to the existence of a contract are sufficient to withstand a motion to dismiss.

B. Motion to Dismiss Kenneth H. Iscol as Defendant

Defendants assert that Lunayach's complaint with respect to defendant Iscol lacks adequate basis to maintain a cause of action. Specifically, defendants assert that plaintiff's allegations that 'on information and belief the corporate defendant is the mere instrumentality and alter ego of Mr. Iscol' and that 'corporate defendant operates as a sham and facade for the personal activities and personal affairs of Mr. Iscol' are conclusory statements, unsupported by fact. Accordingly, defendants assert that Mr. Iscol should be dismissed from this suit. We reject this argument.

While it is true that plaintiff's allegations are cursory, this is to be expected at this early stage in the litigation. Discovery has not yet commenced. We can not say at this point in the proceedings that it is 'beyond doubt' that plaintiff can 'prove no set of facts' in support of its claim that would entitle it to relief against Mr. Iscol. As defendants should well know, a corporate entity may be ignored, and the corporate veil pierced, whenever an individual dominates an organization so as 'in reality to negate the separate personality.'Labadie Coal Co. v. Black,

672 F.2d 92 (D.C. Cir. 1982). Plaintiff asserts, in effect, that this is a fact which permeates the instant action. Resolving, as we must, all ambiguities in favor of the plaintiff, we reject defendants' motion to dismiss defendant Iscol from this action.

C. Failure to Comply with Fed. R. Civ. P. 8(a)

Defendants seek dismissal of this claim on the grounds that plaintiff has failed to comply with the minimal pleading requirements set forth in Fed. R. Civ. P. 8(a). We reject this argument. A complaint need only contain a short, plain statement of the claim, indicating that plaintiff is entitled to relief, and giving defendant fair notice of the nature of plaintiff's grievance, in order to meet the dictates of the rule. In addition, this rule must be read in conjunction with Fed. R. Civ. P. 8(e) and 8(f), which state, respectively, that a 'simple, concise and direct' statement is all that is needed, and that 'pleadings are to be construed so as to do substantial justice.'We find that the complaint, while somewhat lengthy is generally well written, and that the defects alleged by defendants are minor at best. Measured by these standards, the complaint as framed is more than adequate.

II. Motion for More Definite Statement

Defendants move pursuant to Fed. R. Civ. P. 12(e) for a more definite statement of plaintiff's complaint. These motions are only appropriately granted where the pleading to which the motion is directed is so vague or ambiguous that the moving party cannot be reasonably expected to respond. Plaintiff's complaint does not fall within this category. The basis for granting a motion for more definite statement is unintelligibility, not mere lack of detail.Towers Tenant Ass'n Inc. v. Towers Ltd. Partnership, 563 F. Supp. 566 (D.D.C. 1983).See also 2A Moore's Federal Practice 2d. § 12.8, at 2395 (1982). We find that plaintiff's complaint is not so vague or ambiguous that defendant can not reasonably be expected to answer. The alleged defects in plaintiff's complaint illustrate a lack of detail, rather than vague or ambiguous terms that prevent response. Again, defendants seek information routinely obtained through discovery. Thus, a more precise statement is not warranted at this time, and any information that defendants seek to prepare for trial may be obtained through the discovery process.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 3
Not Reported in F.Supp., 1988 WL 4245 (D.D.C.)
**(Cite as: Not Reported in F.Supp., 1988 WL 4245)**

III. Motion to Transfer

**\*3** Defendants move, pursuant to 28 U.S.C. § 1404(a) (1982)[FN3], to transfer this action to the United States District Court of the Southern District of New York. Defendants contend that the factual nexus with New York, and the convenience of defendants and many of the potential witnesses, argue in favor of transfer, and make New York the 'center of gravity' of this action. Specifically, defendants state that defendant Zackiva is a New York corporation with its principle offices in New York, and that defendant Iscol is a New York resident. In addition, defendants assert that many of the witnesses necessary to defend this suit reside in New York.

Plaintiff objects to defendants' motion to transfer on two grounds. First, Lunayach asserts that the defendants are precluded from raising this argument pursuant to a contractual agreement between the parties. In the contract, defendants agreed to 'waive any objections of service of process by seller [plaintiff] in any jurisdiction of seller's choosing and to accept service of process from any court in any such jurisdiction.' Plaintiff asserts that defendants are accordingly contractually bound to refrain from challenging plaintiff's chosen forum. Second, plaintiff asserts that the District of Columbia is the most convenient forum for itself and many of the witnesses, and that Washington, D.C. is in effect the 'center of gravity' of this litigation. In support of its argument, plaintiff asserts that the contract was entered into in the District of Columbia, since Lunayach's signature was the last one on the contract, and that the contract was performed by Lunayach in the District of Columbia, where the exhibits were prepared, checked and verified.

Under § 1404(a), defendants, the moving parties, bear the burden of pursuading this court that transfer is appropriate.SEC v. Savoy Industries, Inc., 587 F.2d 1149, 1154 (D.C. Cir. 1978), cert. deniedZimmerman v. SEC, 440 U.S. 913 (1979).See also Coalition on Sensible Transportation, Inc. v. Doyle, 631 F. Supp. 1382, 1387 (D.D.C. 1986), aff'd826 F.2d 60 (D.C. Cir. 1987). The proper technique for determining a § 1404(a) motion is a factually oriented, 'case-by-case' evaluation of the various relevant factors.Van Dusen v. Barrack, 376 F.2d 612, 622 (D.C. Cir. 1964).See also SEC v. Savoy Industries, Inc., 587 F.2d at 1154.

The statutory considerations set forth in § 1404(a) are: 1) the convenience of the parties; 2) the convenience of the witnesses; and 3) the interest of justice.[FN4]

Applying these principles to the case at hand, we find that defendants have failed to sustain their burden of establishing that transfer is appropriate.[FN5] Both plaintiff and defendants claim that their favored jurisdiction would be most convenient, for themselves and for the majority of witnesses. We are unconvinced from the record before us that New York would be the more convenient forum. In addition, we can not agree that the center of gravity in this case lies in New York. The contract was formally entered into in Washington D.C., and was executed here. We are likewise unconvinced that the interests of justice require that we transfer this suit.[FN6]

**\*4** Accordingly, it is by the court this 13th day of December, 1987

ORDERED that defendants' motion to dismiss is denied; and it is

ORDERED that defendants' motion for a more definite statement is denied, and it is

ORDERED that defendants' motion to transfer is denied, and it is

FURTHER ORDERED that a status call be set for January 14, 1988, 9:30 a.m., Courtroom 12, United States District Court for the District of Columbia.

> FN1 The complaint alleges that goods and services were provided by plaintiff, Complaint ¶24(a); that defendants requested these services and knew that plaintiff expected to be compensated for the services provided under certain circumstances, Id. at ¶13, and that defendants accepted the goods and used and benefited from them without paying plaintiff for them, Id. at ¶24(b).

> FN2 Legal assertions are not to be admitted for purposes of a motion to dismiss. Thus, we examine plaintiff's allegation, and its sufficiency, for ourselves.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1988 WL 4245 (D.D.C.)
**(Cite as: Not Reported in F.Supp., 1988 WL 4245)**

<u>FN3</u><u>Section 1404(a)</u> provides that '[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district court division where it might have been brought.'<u>28 U.S.C. § 1404(a) (1982)</u>.

<u>FN4</u> While other factors are often appropriately considered as well, <u>SEC v. Page Airways, Inc., 464 F. Supp. 461 (D.D.C. 1978)</u>, based on the record before us, and the contentions of the parties, we will confine our consideration to the three factors identified.

<u>FN5</u> We find it unnecessary to reach the issue of whether the contractual provision identified by plaintiff constitutes a waiver of objection by defendants or, as defendants assert, simply an agreement to accept service of process. We find that even absent this consideration, defendants have failed to meet their burden of establishing that transfer is warranted.

<u>FN6</u> In view of this disposition, it is not necessary that we consider, <u>sua sponte</u>, the preference normally accorded to plaintiff's choice of a forum.

D.D.C., 1988.
Lunayach Communications Consultants, Inc. v. Zackiva Communications Corp.
Not Reported in F.Supp., 1988 WL 4245 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Jeffrey S. Jacobovitz, an attorney, on **May 12, 2008**, caused a true and correct copy of

*Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss,* to be

served upon the following via CM/ECF and U.S. Mail:


Alisa H. Reff, Esq.
D.C. Bar No. 423113
1500 K Street, N.W.
Washington, D.C. 20005-1209
Tel:  (202) 842-8852
Fax:  (202) 842-8465
Email:  Alisa.Reff@dbr.com

Thomas J. Barton, Esq.
James G. Fannon, Esq.
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Tel:  (215) 988-2863
Fax:  (215) 988-2757
Email:  Thomas.Barton@dbr.com
Email:  James.Fannon@dbr.com


                    /s/ Jeffrey S. Jacobovitz
                   Jeffrey S. Jacobovitz

DC\7090587.1