IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRYAN H. SIMMS
      Plaintiff,

v.

BALL STREET VENTURES, LLC, et al.
      Defendants.

Case: 1:08-cv-00177-RWR
Hon. Richard W. Roberts

**DEFENDANTS' NOTICE OF COURT'S MINUTE ORDER**
<u>**REGARDING SEALING OF DOCUMENT**</u>

Pursuant to the Minute Order granting Defendants' Consent Motion to Seal Exhibit A, as previously filed with Defendants' Answer and Counterclaims and Motion to Dismiss, entered by Judge Richard W. Roberts on May 19, 2008, Defendants Ball Street Ventures, L.L.C. ("Ventures"), Ball Street Partners, L.L.C. ("Partners"), Ball Street Fund, L.L.C. ("Fund"), Christian Laettner ("Laettner"), and Brian K. Davis ("Davis") (collectively, "Defendants"), by and through their undersigned counsel, submit the attached redacted version of Exhibit A, as previously filed with Defendants' Answer and Counterclaim and Motion to Dismiss, on April 24, 2008, to be included on the public docket.

**WHEREFORE**, Defendants respectfully request that the Clerk substitute the attached redacted version of Exhibit A in lieu of the version previously filed on April 24, 2008, thereby removing the un-redacted version from the public docket and placing it under seal.

May 20, 2008

Respectfully submitted,

SCHIFF HARDIN LLP

By: /s/ Jeffrey S. Jacobovitz

Jeffrey S. Jacobovitz, Esq.
D.C. Bar # 346569
1666 K Street, N.W., Suite 300
Washington, D.C. 20006
Tel: (202) 778-6400
Fax: (202) 778-6460
Email: jjacobovitz@schiffhardin.com
*Attorney for Defendants Ball Street Ventures, LLC; Ball Street Partners, LLC, Ball Street Fund, LLC, Christian Laettner, and Brian K. Davis*

DC\7092328.1

# Exhibit A
## (Redacted)

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into as of September __, 2007 between Ball Street Ventures LLC, a Delaware limited liability company (the "Company"), Ball Street Partners. LLC ("*Partners*"), and Bryan H. Simms, a resident of Connecticut ("Executive").

## BACKGROUND

The Company desires to employ Executive as Chief Executive Officer and Executive desires to accept employment with the Company on the terms and conditions set forth below. The parties acknowledge that Executive is resigning from his position as Senior Vice President with Lehman Brothers of New York to accept the Company's offer of employment set forth in this Agreement, and that as a consequence of Executive's termination of employment from Lehman Brothers, Executive will have an obligation to repay to Lehman a loan in the principal amount of $742,847.16, plus interest at Lehman's margin rate of interest. This loan would have been forgiven by Lehman Brothers had Executive continued in employment with Lehman Brothers.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

### TERMS OF ENGAGEMENT; DUTIES

*Section 1.1* *Terms.* The Company hereby employs Executive as Chief Executive Officer, and Executive hereby accepts employment by the Company subject to the terms and conditions hereof. The Effective Date of this Agreement is September 10, 2007. Executive shall report to the Managing Partner of the Company and shall perform such lawful duties as are reasonably related to his Chief Executive Officer duties described herein.

*Section 1.2* *Duties.* Throughout the term of this Agreement, Executive shall devote such portion of Executive's business effort, time, energy, and skill (reasonable vacations and reasonable absences due to illness excepted) as may be reasonably necessary to fulfill the duties of Chief Executive Officer of the Company. Executive shall not be required to relocate his residence from his residence in Connecticut.

*Section 1.3* *Employment with Grizzlies Acquisition Holdings and/or related Companies.* The parties acknowledge and agree that, upon completion of purchase, Executive will also hold an executive position with Grizzlies Acquisition Holdings, or a related company, owning and operating the professional National Basketball Association franchise Memphis Grizzlies, at a salary of five hundred thousand dollars ($500,000.00) per year, and shall also receive a one percent (1%) interest in Grizzlies Acquisition Holdings and/or the related company. The Company agrees and acknowledges that Executive will spend effort, time, and

energy in connection with Executive's duties for the Memphis Grizzlies during the Term of this Agreement. The Company agrees and acknowledges that Executive's efforts and time spent on Memphis Grizzlies matters during the term of this Agreement is not violation of this Agreement or in conflict with Executive's duties to the Company.

*Section 1.4    Orbit Holdings Obligations to Executive.* Company acknowledges and agrees that Executive is entitled to a 5% finders fee from Orbit Holdings on amounts up to $115 million with respect to amounts to be invested in Orbit Holdings. The parties acknowledge and agree that such payments by and obligations of Orbit Holdings to Executive are not in violation of or in conflict with Executive's duties to the Company.

## ARTICLE II

### COMPENSATION

In consideration of the services rendered by Executive pursuant to this Agreement, the Company shall pay or provide the following:

*Section 2.1    Base Salary.* During the term of his employment hereunder, as of the Effective Date, Executive shall be paid a base salary of at least One Hundred Thousand Dollars ($100,000.00) per month (the "*Base Salary*"), which Base Salary will be reviewed by the President of the Company at least once each year and may be increased by the Company from time to time. The Base Salary shall be paid in accordance with the Company's standard payroll practices in effect from time to time. All payments to Executive hereunder shall be subject to such deductions and withholdings as are required by law or as authorized in writing by Executive to the extent permitted by law.

*Section 2.2    Benefits.* The Company shall provide Executive medical, dental, disability, life insurance, and retirement benefits from the Company, and Executive shall participate in any executive or employee benefit plans, including but not limited to, any health, life, savings, pension, profit sharing, equity, or other benefit plans or practices in which other senior management employees of the Company participate. In addition, the Company agrees to provide Executive with the use of an office and such support services, staff and supplies as are consistent with his duties and status as Executive Officer of the Company and his residence in Connecticut.

*Section 2.3    Business Expenses.* The Company shall reimburse Executive or otherwise provide and pay for all reasonable business, travel and entertainment expenses incurred by Executive in furtherance of or in connection with the business of the Company, subject to compliance with the reasonable expense reimbursement policies established by the Company and in sufficient detail to comply with Internal Revenue Service Regulations. In addition, the Company shall reimburse Executive or otherwise provide and pay for all professional and business affiliation expenses incurred by Executive.

*Section 2.4    Executive's Equity Interest in Ball Street Partners, LLC.* Upon the Effective Date of this Agreement, Executive shall immediately receive a fifteen percent (15%) equity interest in Ball Street Partners, LLC ("*Partners*"). Executive's equity interest in *Partners*

shall at all times (including, without limitation, after termination of Executive's employment) be subject to (1) the right of *Partners*, in the event Executive elects to sell his interest in *Partners*, to purchase Executive's equity interest at *Fair Market Value* ("Right of First Refusal"); and also (2) a right by *Partners* to require Executive to sell his equity interest in *Partners* at no lower valuation than that received by the majority equity interest of *Partners* ("Right to Drag Along"). Executive (or Executive's Estate if applicable) shall have the right, in the event the majority equity interest of *Partners* is sold, to require *Partners* to purchase his equity interest in *Partners* at the same valuation received by the majority equity interest of *Partners* ("Right to Tag Along"). After termination by Company of Executive's Company employment for any reason, Executive (or Executive's Estate if applicable) shall have the right to require *Partners* to purchase his equity interest in *Partners* at *Fair Market Value*. *Fair Market Value* shall mean the valuation agreed upon by Executive (or Executive's Estate if applicable) and *Partners* under the circumstances; *provided*, that if Executive (or Executive's Estate if applicable) and *Partners* are not able to agree upon the valuation, Executive and *Partners* shall each appoint certified public accountants to represent them and determine the valuation. In the event the representative certified public accountants cannot agree upon the valuation, the representative certified public accountants shall together select a third certified public accountant who shall determine the *Fair Market Value* and whose determination shall be final and binding on all parties.

*Section 2.5    Signing Bonus.* The parties agree and acknowledge that Executive's former employer, Lehman Brothers, will require Executive to repay to Lehman a note, attached hereto, in the amount of seven hundred forty-two thousand, eight hundred forty-seven dollars and sixteen cents ($742,847.16), plus interest at Lehman's margin rate of interest, and that this note would have been forgiven by Lehman Brothers had Executive continued in employment with Lehman Brothers. To the extent Executive is required to pay any amounts due under the Lehman Notes, Company agrees to accept joint and several liability with Executive to pay such amounts on behalf of Executive as they come due to discharge Executive's obligations under the Lehman Notes, to the extent such amounts come due during the course of Executive's employment with Company.

*Section 2.6    Grizzlies Holdings Compensation.* The foregoing compensation from the Company shall be in addition to the annual salary of five hundred thousand dollars ($500,000.00) and the a one percent (1%) ownership interest that Executive shall receive from Grizzlies Acquisition Holdings and/or related companies, upon completion of that purchase.

## ARTICLE III

### TERM AND TERMINATION

*Section 3.1    Defined Terms.* The following terms used herein shall have the definitions set forth below:

"*Cause*" means (i) conduct amounting to fraud or dishonesty against the Company or any subsidiary or affiliate of the Company; (ii) Executive's intentional misconduct, repeated refusal to follow the reasonable directions of the Managing Partner of the Company or material breach of this Agreement, *provided* the Managing Partner of the Company, upon the direction of the Partners, notifies Executive of the acts deemed to

constitute such intentional misconduct, repeated refusal or material breach in writing and Executive fails to correct such acts (or begin such action as may be necessary to correct such acts and thereafter diligently pursues the completion thereof) within five (5) business days after written notice has been given; or (iii) a conviction or plea of guilty or *nolo contendere* to a felony (other than one arising from the operation of a motor vehicle or resulting from actions taken (or not taken) by Executive in good faith in his capacity as an employee or officer of the Company).

"*Change in Control*" means (i) an acquisition of forty per cent (40%) or more of *Partners*, by a person who did not hold an ownership interest in *Partners* as of the Effective Date of this Agreement; (ii) a change in the Managing Partner of *Partners*; (iii) a merger or similar combination of Ball Street Ventures, LLC and/or *Partners* in which the current partners of *Partners* are not the controlling partners/owners of the surviving entity; or (iv) a sale of substantially all of the assets or liquidation of Ball Street Ventures, LLC or *Partners*. For purposes of this Agreement, the *Change in Control Effective Date* shall be the closing date of the sale or other disposition that accomplishes the *Change in Control*. For purposes of this Agreement, *Change in Control* does not apply to interests in *Partners* granted to employees of *Company* as part of their executive compensation.

"*Disability*" means (i) the inability of Executive to perform the duties of Executive's employment due to physical or emotional incapacity or illness, where such inability is reasonably expected to be of long-contained and indefinite duration (*i.e.*, for at least twelve (12) months); or (ii) Executive shall be entitled to (x) disability retirement benefits under the federal Social Security Act or (y) recover benefits under any long-term disability plan or policy maintained by the Company. In the event of a dispute, the determination of Disability shall be made reasonably by the Partners of the Company and shall be supported by advice of a physician competent in the area to which such Disability relates.

"*Effective Date*" means the date of this Agreement.

"*Good Reason*" means (i) any materially adverse change in the duties, responsibilities, total compensation and benefits package or status of the Executive to which he has objected in writing and the Company has not cured or taken reasonable steps to cure within thirty (30) days of receipt of such written objection; (ii) the assignment of Executive to a location outside of a fifty (50) mile radius from his current residence in Connecticut to which Executive has objected in writing to Company, and Company has not rescinded such assignment within thirty (30) days of receipt of such written objection; (iii) conduct on the part of the Company amounting to fraud or dishonesty against Executive; (iv) the Company's conviction or plea of guilty or *nolo contendere* to a felony; or (v) the occurrence of a "*Change in Control*" as defined herein, provided the Executive exercises his right to resign no later than six months after the *Change in Control Effective Date*, as defined above.

Section 3.2  The term of this Agreement and of Executive's employment hereunder shall commence on the Effective Date and shall continue until terminated as provided herein.

Section 3.3    *Termination.*  This Agreement and Executive's employment hereunder may be terminated:

    (a)    Upon the death or Disability of Executive;

    (b)    By the Company immediately for Cause;

    (c)    By the Company, without Cause, immediately upon giving Executive written notice;

    (d)    By Executive immediately for Good Reason;

    (e)    By mutual agreement between Executive and the Company; or

    (f)    By Executive upon forty-five (45) days' advanced written notice, during which time Executive shall continue to perform his duties hereunder.

Section 3.4    *Remuneration.*  Except as otherwise specified herein, upon termination of Executive's employment hereunder pursuant to this Article IV, the Company shall have no further obligation to Executive or Executive's estate or personal representative in the case of death with respect to remuneration due under this Agreement, except for salary and vacation pay, earned but unpaid at the date of termination, and such amounts, if any, due Executive under Section 2 hereof but unpaid as of the date of termination.

Section 3.5    *Severance Payments.*  Upon termination of Executive's employment hereunder pursuant to Section 3.3(c) or 3.3(d), the Company shall pay to Executive, as severance pay hereunder, (i) an amount equal to twelve (12) months of his then-current salary in effect at the time of termination paid in six equal payments over the first six months following his Date of Termination (as defined below); (ii) COBRA premiums to provide continued medical coverage at Company expense for Executive and his family throughout the COBRA period; and (iii) a $15,000.00 allowance for outplacement services for Executive due on the first day of the month following termination.

Upon termination of Executive's employment pursuant to Section 3.3(a), this Agreement shall terminate and no further salary, benefits or compensation of any type shall be payable to the Executive after the date of termination, except that the Executive or the Executive's estate, heirs or beneficiaries, as applicable, shall be entitled to any benefits specifically provided to them or the Executive under any benefit plan, and all compensation earned but not yet paid.

Upon termination of Executive's employment pursuant to Section 3.3(b) or 3.3(e) or 3.3(f), this Agreement shall terminate and no further salary, benefits or compensation of any type other than amounts due under Section 2 but not yet paid as of the date of termination, shall be paid to the Executive under the terms of this Agreement after the date of termination, except the Executive shall retain the right to participate in benefit plans under Section 2.3 subject to the terms of those plans and applicable federal and state law.

Executive's equity interest in Partners shall not be forfeited by termination of his employment for any reason, and the rights of the parties as provided in Section 2.5, including

without limitation the Right of First Refusal, Right to Drag Along, and Right to Tag Along, shall continue to apply to the Executive's interest after his employment.

The parties recognize that the severance payments provided for in subsection (i) of the first paragraph of this Section 3.5 of this Agreement (the "Non-Exempt Payments") are subject to Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and agree to work together in good faith to amend this Agreement if necessary to comply with Section 409A of the Code. If securities of *Partners* (or any corporation, trade or business that would be treated as a single employer with *Partners* under Sections 414(b) or (c) of the Code) are publicly traded on an established securities market on the Executive's Date of Termination (as defined below), and the Executive is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code as of such date, then no Non-Exempt Payment shall be made to the Executive before the earlier of (i) the date which is six months after the Executive's Date of Termination or (ii) the date of the Executive's death, and any Non-Exempt Payment that would otherwise have been made to the Executive under this Agreement during such period shall be accumulated without interest and paid to the Executive on the earlier of such dates. For purposes of this Section 3.5, "Date of Termination" shall mean the date of the Executive's "separation from service" (as defined in Section 409A of the Code).

## ARTICLE IV

### MISCELLANEOUS

*Section 4.1*    *Assignment.* This Agreement and the rights and obligations of the Company hereunder may be assigned by the Company to any subsidiary of or successor to the Company, and shall inure to the benefit of, shall be binding upon, and shall be enforceable by any such assignee, *provided* that any such assignee shall agree in writing to assume and be bound by this Agreement and a copy of such writing is delivered to Executive at the time of such assignment, and the Company shall remain liable hereunder. This Agreement and the rights and obligations of Executive hereunder may not be assigned by Executive.

*Section 4.2*    *Waiver.* This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties with respect to Executive's employment by the Company. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a waiver of waiver unless otherwise expressly provided. The Company, on the one hand, and Executive, on the other hand, may by written instrument only, (a) waive compliance with any of the covenants of the other party contained in this Agreement; and (b) waive the other party's performance of any of the obligations set out in this Agreement.

*Section 4.3*    *Choice of Law.* This Agreement and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

*Section 4.4    Notices.* Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered in person or by courier (effective when delivered), telegraphed, telexed or by facsimile transmission (effective when received) or mailed by certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged), as follows:

| | |
|---|---|
| If to the Company: | The Company's principal business address, to the Attention of the Managing Partner, which is presently:<br>Ball Street Ventures, LLC<br>1000 Wisconsin Ave., NW, Suite G-100<br>Washington, DC 20007<br>Attn: Managing Partner |
| If to Executive: | Last address of Executive known to Managing Partner, ~~Presently:~~<br>32 Hitchcock Road<br>Westport, Connecticut, 06880 |

*Section 4.5    Counterparts.* This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

*Section 4.6    Binding Effect.* The rights and obligations of the parties under this Agreement shall inure to the benefit of and shall be binding upon the respective representatives, successors and assigns of the Company, *Partners,* and Executive. The Company and *Partners* represent and warrant to Executive that they have all necessary power, right, capacity, and authority to execute this Agreement, to consummate the transactions contemplated herein, and to perform this Agreement and related transactions.

[SIGNATURE PAGE TO FOLLOW.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

COMPANY:

BALL STREET VENTURES, LLC

By: _____
Brian K. Davis, Managing Partner

BALL STREET PARTNERS, LLC

By: _____
Brian K. Davis, Managing Partner

---

EXECUTIVE:

_____  9/10/07
Bryan H. Simms

PROMISSORY NOTE                August 29, 2007

In consideration of a loan from Lehman Brothers Inc. ("Lehman"), receipt of which is hereby acknowledged, the undersigned Bryan Simms (the "Borrower"), hereby promises to pay Lehman the principal sum of $742,857.16, with interest at the Firm's margin rate of interest, at its offices at 399 Park Ave, New York, New York, or to the order of Lehman. The Borrower hereby agrees to the following terms and conditions:

1. Payment. The principal and interest shall be payable to Lehman through personal check or wire transfer on the following schedule:

   - September 10, 2008 - $297,142.86 (40% of the outstanding principal balance), plus accrued interest at the Firm's margin rate through the repayment date
   - September 10, 2009 – $445,714.30 (60% of the outstanding principal balance), plus accrued interest at the Firm's margin rate through the repayment date

   Interest at the Firm's margin rate of interest shall continue to accrue until the full amount of the outstanding loan, including accrued interest, is repaid to the Firm.

2. Prepayment. The Borrower shall have the right at any time to prepay part or all of the unpaid principal, plus accrued interest through the date of payment, without penalty or premium.

3. Indemnification. The Borrower further promises to pay and indemnify Lehman for all expenses incurred, including attorneys' fees, in connection with the collection of any amount due under this Note. The amount the Borrower may be liable for under this paragraph shall be the greater of the actual expenses incurred by Lehman or 15% of the unpaid balance of the Note at the time any proceedings are instituted for collection.

4. Default. In the event of any default in payment under the terms of this Note for any reason whatsoever, the balance due hereunder will become immediately due and payable. The Borrower shall also be deemed to be in default hereunder if she is adjudicated bankrupt, makes an assignment for the benefit of creditors or files a petition for relief under the Bankruptcy Act.

5. Waivers. The Borrower hereby waives presentment, demand for payment, notice of dishonor, protest and any and all other notices and demands in connection with the delivery, acceptance, performance, default or enforcement of this Note. No delay by the holder in exercising any power or right hereunder shall operate as a waiver of any power or right; nor shall any single or partial exercise of any power or right operate as such a waiver. No waiver or modification of the terms hereof shall be valid unless writing, signed by the holder of this Note and then only to the extent therein set forth.

6. Deductions. Lehman shall have the right, without notice, to withhold from any amounts payable by Lehman to the undersigned, as salary, bonus, commissions, separation

payments, severance or otherwise, or to deduct monies from any security or commodity account the Borrower maintains with Lehman or from any amounts payable under any non-qualified deferred compensation, stock award or similar program or arrangement sponsored by Lehman or any of its affiliated companies, and to apply such withheld or deducted amounts to satisfy the indebtedness due under this Note. The Borrower hereby authorizes and consents to the aforementioned deductions.

7. <u>Arbitration</u>. The undersigned hereby agrees that any controversy arising out of or relating to this Note, or default on this Note, shall be submitted to and settled by arbitration pursuant to the constitution, by-laws, rules and regulations of the New York Stock Exchange or the National Association of Securities Dealers.

8. <u>Transferability</u>. The Borrower may not transfer any part of this loan to any other individual or entity.

9. <u>Governing Law</u>. This Note shall be governed by the substantive laws of the State of New York without regard to conflict of laws principles.

_____
Date

_____
Bryan Simms
SS#  [REDACTED]
P&L: 00306

STATE OF_____

COUNTY OF_____

SUBSCRIBED AND SWORN TO BEFORE ME ON_____2007.

_____
NOTARY PUBLIC

REDACTED

**CERTIFICATE OF SERVICE**

      I, Jeffrey S. Jacobovitz, an attorney, on **May 20, 2008**, caused a true and correct copy of *Defendants' Notice of Court's Minute Order Regarding Sealing of Document,* to be served upon the following via CM/ECF and U.S. Mail:

Alisa H. Reff, Esq.
D.C. Bar No. 423113
1500 K Street, N.W.
Washington, D.C. 20005-1209
Tel:  (202) 842-8852
Fax:  (202) 842-8465
Email:  Alisa.Reff@dbr.com

Thomas J. Barton, Esq.
James G. Fannon, Esq.
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Tel:  (215) 988-2863
Fax:  (215) 988-2757
Email:  Thomas.Barton@dbr.com
Email:  James.Fannon@dbr.com

                                            /s/ Jeffrey S. Jacobovitz
                                                Jeffrey S. Jacobovitz