## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BRYAN H. SIMMS** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case: 1:08-cv-00177-RWR** |
| v. | : | **Hon. Richard W. Roberts** |
| | : | |
| **BALL STREET VENTURES, LLC, et al.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION TO FILE A FIRST AMENDED COMPLAINT

Defendants Ball Street Ventures, L.L.C. ("Ventures"), and Ball Street Partners, L.L.C. ("Partners"), through the undersigned counsel, submit the following memorandum of points and authorities in opposition to Plaintiff Bryan H. Simms' ("Simms") Motion to File a First Amended Complaint.[1] For the reasons that follow, Defendants respectfully request that this Court deny Plaintiff's motion.

## INTRODUCTION

In the proposed First Amended Complaint, Simms asserts essentially identical allegations as set forth in the original Complaint: that his former employers, Ventures and Partners, have breached his Employment Agreement ("Agreement") by terminating his employment and through their subsequent actions. Despite the fact that this Court has already dismissed Davis, Laettner and Fund from this action, Plaintiff improperly attempts to reassert similar allegations against them. The facts have not changed. Davis, Laettner and Fund were never his employers

---

[1] Should this Court grant Plaintiff's Request to file an Amended Complaint, Defendants reserve the right to file a responsive pleading to Plaintiff's Amended Complaint in accordance with the time period set forth in the Federal Rules of Civil Procedure.

nor were they parties to Simms' Agreement. (*See* Employment Agreement, attached hereto as Exhibit A ("Ex. A")); (*see also* Minute Order, attached hereto as Exhibit B ("Ex. B")). Because Plaintiff's allegations against Laettner, Davis and Fund remain deficient and any amendments to the Complaint will be futile, this Court should deny Plaintiffs' Motion to File a First Amended Complaint, as it pertains to Laettner, Davis and Fund.

## ARGUMENT

I.  **The Amendment of Simms' Complaint Would be Futile Because Plaintiff's Amended Complaint Fails to Assert Sufficient Allegations to Support a Claim against Laettner, Davis and Fund.**

Courts in this Circuit have held that futility of an amendment constitutes grounds for denial of a motion to amend. *James Madison Ltd. By Hecht v. Ludwig*, 82 F.3d 1085, 1099 (C.A.D.C. 1996); *see also National Wrestling Coaches Ass'n v. Dept. of Educ.*, 366 F.3d 930, 945 (C.A.D.C. 2004) (holding that the court has discretion to deny a motion to amend on grounds of futility where a proposed pleading would not survive a motion to dismiss). An amendment is futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss. 3 Moore's Federal Practice § 15.15 [3] (3d ed. 2008). Here, Plaintiff's proposed First Amended Complaint would be subject to dismissal because (1) Plaintiff restates the same facts as the original complaint, purportedly in different terms, (2) the Court already ruled that Plaintiff failed to assert allegations which support viable claims against Laettner, Davis, and Fund, and (3) the Court already dismissed Davis, Laettner, and Fund from this lawsuit on grounds that there was insufficient basis for "piercing the corporate veil." Accordingly, this Court should exercise its discretion and deny Plaintiff's motion to amend. *See Doe v. McMillan*, 566 F.2d 713, 720 (C.A.D.C. 1977) (denying Plaintiff's motion for leave to

amend complaint and holding that the decision to grant or deny leave to amend is vested in the sound discretion of the court).

II.    **Simms' Proposed First Amended Complaint Fails to Set Forth Viable Claims Against Fund, Laettner, and Davis, and Fails to Provide Fair Notice to Fund, Laettner, and Davis.**

Simms' proposed allegations consist of "vague and conclusory statements," which are insufficient under Federal pleading standards. *See Hilska v. Jones*, 217 F.R.D. 16, 21 (D.D.C. 2003). Simms must at the very least "give [defendants] fair notice of what the . . . [plaintiff's] claim is and the *grounds* upon which it rests." *See Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1964 (2007) (emphasis added). "A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *See Rehabcare Group E., Inc.*, No. 07 C 2923, 2007 WL 3334500 at * 1 (N.D. Ill. Nov. 8, 2007) (citing *Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1964-65 (2007)) (attached hereto as Exhibit C). "Factual Allegations must be enough to raise a right to relief above the speculative level." (*Id.*)

A.    **Claims Against Fund**

In the Proposed First Amended Complaint, Plaintiff attempts to assert the same claims against Fund alleged in the original Complaint. Despite adding a brief and conclusory statement regarding Plaintiff's "belief" with regard to the operations of Ventures, Partners and Fund, Plaintiff's allegations are still fundamentally deficient because he provides no "short and plain statement" as to what his specific claims against Fund are, nor on what basis he makes any claims against that entity. Federal Rule of Civil Procedure 8(a) provides that, in bringing a complaint, a plaintiff must allege "a short and plain statement of the claim" that will give the defendant fair notice of what the claim is, and the basis for that claim. Fed. R. Civ. P. 8(a); *Major v. Plumbers Local Union No. 5 of United Ass'n of Journeymen*, 370 F. Supp. 2d 118, 123 (D.D.C. 2005). When a complaint does not provide the required "short and plain statement," but

3

instead relies on vague and conclusory statements, the complaint does not comply with Rule 8(a), does not provide the defendant with fair notice of the plaintiff's claims, and is subject to dismissal. *Hilska v. Jones*, 217 F.R.D. 16, 21 (D.D.C. 2003).  The only allegations in Simms' Complaint specifically directed at Fund are (1) the paragraph wherein he recites the jurisdictional allegations regarding Fund (First Amended Complaint, ¶ 4), and (2) his conclusory statement that Fund (in conjunction with Ventures and Partners) operate as a single business enterprise and are a collective façade for the personal activities and affairs of Defendants Davis and Laettner. (First Amended Complaint, ¶ 7)  Neither allegation establishes a cause of action against Fund.  In fact, Fund was not even a party to the employment agreement which purports to give rise to Simms' claims. (*See* Ex. A.)

As a result of this deficiency, Fund has not received fair notice of the claims Simms is making against it.  Moreover, Fund has previously been dismissed from this action for essentially the same theories.  Consequently, permitting the addition of the proposed allegations against Fund would futile, as these claims would not survive a motion to dismiss. *James Madison Ltd.*, 82 F.3d at 1099.  Accordingly, Plaintiff's Motion to File a First Amended Complaint, as it pertains to Fund should be denied.  (*Id.*)

**B. <u>Claims Against Laettner and Davis</u>**

Plaintiff's motion should also be denied because the allegations against Davis and Laettner, in their individual capacities, are not sufficient to establish viable claims.  The undisputed facts demonstrate that neither Davis nor Laettner were parties to the employment agreement between Plaintiff and Venture/Partners.  Indeed, the Court has already ruled that these individuals were not parties to the Agreement and that the original allegations set forth against them were not sufficient to maintain a claim.  Nevertheless, Plaintiff attempts to rectify this deficiency—unsuccessfully—by setting forth allegations based upon supposition and conjecture.

Plaintiff's effort must be denied.  The only new allegations set forth against Davis and Laettner are Plaintiff's conclusory and speculative assertions that he "*believes and therefore avers*" that Davis and Laettner "separately and together treated the in-house general counsel for the collective Ball Street Entities as their own personal lawyer" (First Amended Complaint, ¶ 9) and that Davis and Laettner "separately and together treated the Ball Street Entities as their own personal financial/lending institution, *possibly* commingling personal and business finances," (First Amended Complaint, ¶ 10) and that Davis and Laettner "so dominate the Ball Street Entities as to negate their separate personalities."  (First Amended Complaint, ¶ 11).  These allegations are wholly unrelated to the claims at bar, as they add no specific allegations regarding the actions of Laettner and Davis as they relate to the employment agreement.

Simms' claims against all Defendants in this matter center on an alleged breach of the employment agreement between Ventures, Partners, and Simms.  His attempt to hold Davis and Laettner individually liable for a dispute arising from that relationship is unavailing.  As a general rule, the members of a limited liability company ("LLC") are not liable for contracts made on behalf of the company.  6 Del. C. § 18-303; Restatement (2d) of Agency § 328 (1958) (agent of a disclosed principal is not liable on the contract); *Wierbicki v. Advatech, LLC*, No 1:06-cv-269, 2007 WL 2725944, *4 (E.D. Tenn. Sept. 17, 2007) (attached hereto as Exhibit D) (applying Delaware law).  While the First Amended Complaint alleges acts purportedly taken by Davis during the negotiation and formation of the employment agreement (First Amended Complaint, ¶ 15), it still acknowledges that the parties entering into the agreement with Simms were Ventures and Partners. (First Amended Complaint, ¶ 14)  Further, the signature page of the agreement itself clearly indicates that Davis was signing the agreement on behalf of the LLCs, in a representative capacity. (Ex. A, p. 8.)  Finally, other than the unrelated and speculative

allegations referenced above, the First Amended Complaint still offers no assertions regarding acts purportedly undertaken by Laettner, in any capacity, as they pertain to the employment agreement.

Simms presents no novel basis for disregarding the general rule limiting the individual liability of LLC members. Despite adding minimal and speculative allegations, Plaintiff still fails to allege facts to justify "piercing the corporate veil" with regard to Laettner and Davis. As Defendants have previously stated, Courts reserve piercing the corporate veil for the rare circumstances in which an individual corporation abuses the corporate form or exerts undue influence over a corporate entity to accomplish an improper or unlawful purpose. *Amore ex. rel. Estates of Amore v. Accor*, 529 F. Supp. 2d 85, 93 (D.D.C. 2008) (denying Plaintiff's attempt to amend the complaint because the Plaintiff's proposed complaint was futile and could not withstand a motion to dismiss; Plaintiff still had no facts on which to pierce the corporate veil). In the District of Columbia, "[a] party seeking to pierce the corporate veil must prove 'by affirmative evidence that [there is] (1) unity of ownership interest, and (2) use of the corporate form to perpetrate a fraud or wrong." *(Id.), citing Ivanov v. Sunset Pools Mgmt. Inc.*, 524 F. Supp. 2d 13, 15 (D.D.C. 2007).

Here, even with his additional assertions, Simms still does not set forth allegations which indicate that Defendants Laettner, Davis and/or Fund used the corporate form to perpetrate a fraud through a "corporate sham," nor do the allegations amply allege justification for circumventing the protection afforded Laettner and Davis, by virtue of their LLC membership. In fact, Simms's First Amended Complaint is notably devoid of allegations that mention or reference the propriety of and need for "piercing the corporate veil" in this matter.

Accordingly, Plaintiff's Motion to File a First Amended Complaint to add further allegations against Laettner and Davis should be denied, because Simms still fails to meet the federal pleading standard, the parties have previously been dismissed from this action for essentially the same claims, and permitting further allegations Laettner and Davis is futile, as these claims would not survive a motion to dismiss. *James Madison Ltd.*, 82 F.3d at 1099.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiff's Motion to File a First Amended Complaint, as it pertains to Laettner, David and Fund.

Dated: August 6, 2008                    Respectfully submitted,

By: /s/ Jeffrey S. Jacobovitz
Jeffrey S. Jacobovitz, Esq.
Schiff Hardin LLP
D.C. Bar # 346569
1666 K Street, N.W., Suite 300
Washington, D.C. 20006
Tel: (202) 778-6400
Fax: (202) 778-6460
Email: jjacobovitz@schiffhardin.com

*Attorney for Defendants Ball Street Ventures, L.L.C.*
*Ball Street Partners, L.L.C., Ball Street Fund,*
*L.L.C., Brian K. Davis, and Christian Laettner*

# EXHIBIT A

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into as of September __, 2007 between Ball Street Ventures LLC, a Delaware limited liability company (the "Company"), Ball Street Partners. LLC ("*Partners*"), and Bryan H. Simms, a resident of Connecticut ("Executive").

## BACKGROUND

The Company desires to employ Executive as Chief Executive Officer and Executive desires to accept employment with the Company on the terms and conditions set forth below. The parties acknowledge that Executive is resigning from his position as Senior Vice President with Lehman Brothers of New York to accept the Company's offer of employment set forth in this Agreement, and that as a consequence of Executive's termination of employment from Lehman Brothers, Executive will have an obligation to repay to Lehman a loan in the principal amount of $742,847.16, plus interest at Lehman's margin rate of interest. This loan would have been forgiven by Lehman Brothers had Executive continued in employment with Lehman Brothers.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## TERMS OF ENGAGEMENT; DUTIES

*Section 1.1    Terms.*  The Company hereby employs Executive as Chief Executive Officer, and Executive hereby accepts employment by the Company subject to the terms and conditions hereof. The Effective Date of this Agreement is September 10, 2007. Executive shall report to the Managing Partner of the Company and shall perform such lawful duties as are reasonably related to his Chief Executive Officer duties described herein.

*Section 1.2    Duties.*  Throughout the term of this Agreement, Executive shall devote such portion of Executive's business effort, time, energy, and skill (reasonable vacations and reasonable absences due to illness excepted) as may be reasonably necessary to fulfill the duties of Chief Executive Officer of the Company.  Executive shall not be required to relocate his residence from his residence in Connecticut.

*Section 1.3    Employment with Grizzlies Acquisition Holdings and/or related Companies.*  The parties acknowledge and agree that, upon completion of purchase, Executive will also hold an executive position with Grizzlies Acquisition Holdings, or a related company, owning and operating the professional National Basketball Association franchise Memphis Grizzlies, at a salary of five hundred thousand dollars ($500,000.00) per year, and shall also receive a one percent (1%) interest in Grizzlies Acquisition Holdings and/or the related company.  The Company agrees and acknowledges that Executive will spend effort, time, and

energy in connection with Executive's duties for the Memphis Grizzlies during the term of this Agreement. The Company agrees and acknowledges that Executive's efforts and time spent on Memphis Grizzlies matters during the term of this Agreement is not violation of this Agreement or in conflict with Executive's duties to the Company.

Section 1.4    *Orbit Holdings Obligations to Executive.*  Company acknowledges and agrees that Executive is entitled to a 5% finders fee from Orbit Holdings on amounts up to $115 million with respect to amounts to be invested in Orbit Holdings. The parties acknowledge and agree that such payments by and obligations of Orbit Holdings to Executive are not in violation of or in conflict with Executive's duties to the Company.

## ARTICLE II

### COMPENSATION

In consideration of the services rendered by Executive pursuant to this Agreement, the Company shall pay or provide the following:

Section 2.1    *Base Salary.*  During the term of his employment hereunder, as of the Effective Date, Executive shall be paid a base salary of at least One Hundred Thousand Dollars ($100,000.00) per month (the "*Base Salary*"), which Base Salary will be reviewed by the President of the Company at least once each year and may be increased by the Company from time to time. The Base Salary shall be paid in accordance with the Company's standard payroll practices in effect from time to time. All payments to Executive hereunder shall be subject to such deductions and withholdings as are required by law or as authorized in writing by Executive to the extent permitted by law.

Section 2.2    *Benefits.*   The Company shall provide Executive medical, dental, disability, life insurance, and retirement benefits from the Company, and Executive shall participate in any executive or employee benefit plans, including but not limited to, any health, life, savings, pension, profit sharing, equity, or other benefit plans or practices in which other senior management employees of the Company participate.  In addition, the Company agrees to provide Executive with the use of an office and such support services, staff and supplies as are consistent with his duties and status as Executive Officer of the Company and his residence in Connecticut.

Section 2.3    *Business Expenses.*  The Company shall reimburse Executive or otherwise provide and pay for all reasonable business, travel and entertainment expenses incurred by Executive in furtherance of or in connection with the business of the Company, subject to compliance with the reasonable expense reimbursement policies established by the Company and in sufficient detail to comply with Internal Revenue Service Regulations. In addition, the Company shall reimburse Executive or otherwise provide and pay for all professional and business affiliation expenses incurred by Executive.

Section 2.4    *Executive's Equity Interest in Ball Street Partners, LLC.*   Upon the Effective Date of this Agreement, Executive shall immediately receive a fifteen percent (15%) equity interest in Ball Street Partners, LLC ("*Partners*").  Executive's equity interest in *Partners*

shall at all times (including, without limitation, after termination of Executive's employment) be subject to (1) the right of *Partners*, in the event Executive elects to sell his interest in *Partners*, to purchase Executive's equity interest at *Fair Market Value* ("Right of First Refusal"); and also (2) a right by *Partners* to require Executive to sell his equity interest in *Partners* at no lower valuation than that received by the majority equity interest of *Partners* ("Right to Drag Along"). Executive (or Executive's Estate if applicable) shall have the right, in the event the majority equity interest of *Partners* is sold, to require *Partners* to purchase his equity interest in *Partners* at the same valuation received by the majority equity interest of *Partners* ("Right to Tag Along"). After termination by Company of Executive's Company employment for any reason, Executive (or Executive's Estate if applicable) shall have the right to require *Partners* to purchase his equity interest in *Partners* at *Fair Market Value*. *Fair Market Value* shall mean the valuation agreed upon by Executive (or Executive's Estate if applicable) and *Partners* under the circumstances; *provided,* that if Executive (or Executive's Estate if applicable) and *Partners* are not able to agree upon the valuation, Executive and *Partners* shall each appoint certified public accountants to represent them and determine the valuation. In the event the representative certified public accountants cannot agree upon the valuation, the representative certified public accountants shall together select a third certified public accountant who shall determine the *Fair Market Value* and whose determination shall be final and binding on all parties.

Section 2.5    *Signing Bonus.*   The parties agree and acknowledge that Executive's former employer, Lehman Brothers, will require Executive to repay to Lehman a note, attached hereto, in the amount of seven hundred forty-two thousand, eight hundred forty-seven dollars and sixteen cents ($742,847.16), plus interest at Lehman's margin rate of interest, and that this note would have been forgiven by Lehman Brothers had Executive continued in employment with Lehman Brothers. To the extent Executive is required to pay any amounts due under the Lehman Notes, Company agrees to accept joint and several liability with Executive to pay such amounts on behalf of Executive as they come due to discharge Executive's obligations under the Lehman Notes, to the extent such amounts come due during the course of Executive's employment with Company.

Section 2.6    *Grizzlies Holdings Compensation.*   The foregoing compensation from the Company shall be in addition to the annual salary of five hundred thousand dollars ($500,000.00) and the a one percent (1%) ownership interest that Executive shall receive from Grizzlies Acquisition Holdings and/or related companies, upon completion of that purchase.

## ARTICLE III

### TERM AND TERMINATION

Section 3.1    *Defined Terms.*   The following terms used herein shall have the definitions set forth below:

"*Cause*" means (i) conduct amounting to fraud or dishonesty against the Company or any subsidiary or affiliate of the Company; (ii) Executive's intentional misconduct, repeated refusal to follow the reasonable directions of the Managing Partner of the Company or material breach of this Agreement, *provided* the Managing Partner of the Company, upon the direction of the Partners, notifies Executive of the acts deemed to

constitute such intentional misconduct; or a repeated refusal to materially and Executive fails to correct such acts (or begin such action as may be necessary to correct such acts and thereafter diligently pursues the completion thereof) within five (5) business days after written notice has been given; or (iii) a conviction or plea of guilty or *nolo contendere* to a felony (other than one arising from the operation of a motor vehicle or resulting from actions taken (or not taken) by Executive in good faith in his capacity as an employee or officer of the Company).

*"Change in Control"* means (i) an acquisition of forty per cent (40%) or more of *Partners*, by a person who did not hold an ownership interest in *Partners* as of the Effective Date of this Agreement; (ii) a change in the Managing Partner of *Partners*; (iii) a merger or similar combination of Ball Street Ventures, LLC and/or *Partners* in which the current partners of *Partners* are not the controlling partners/owners of the surviving entity; or (iv) a sale of substantially all of the assets or liquidation of Ball Street Ventures, LLC or *Partners*. For purposes of this Agreement, the *Change in Control Effective Date* shall be the closing date of the sale or other disposition that accomplishes the *Change in Control*. For purposes of this Agreement, *Change in Control* does not apply to interests in *Partners* granted to employees of *Company* as part of their executive compensation.

*"Disability"* means (i) the inability of Executive to perform the duties of Executive's employment due to physical or emotional incapacity or illness, where such inability is reasonably expected to be of long-contained and indefinite duration (*i.e.*, for at least twelve (12) months); or (ii) Executive shall be entitled to (x) disability retirement benefits under the federal Social Security Act or (y) recover benefits under any long-term disability plan or policy maintained by the Company. In the event of a dispute, the determination of Disability shall be made reasonably by the Partners of the Company and shall be supported by advice of a physician competent in the area to which such Disability relates.

*"Effective Date"* means the date of this Agreement.

*"Good Reason"* means (i) any materially adverse change in the duties, responsibilities, total compensation and benefits package or status of the Executive to which he has objected in writing and the Company has not cured or taken reasonable steps to cure within thirty (30) days of receipt of such written objection; (ii) the assignment of Executive to a location outside of a fifty (50) mile radius from his current residence in Connecticut to which Executive has objected in writing to Company, and Company has not rescinded such assignment within thirty (30) days of receipt of such written objection; (iii) conduct on the part of the Company amounting to fraud or dishonesty against Executive; (iv) the Company's conviction or plea of guilty or *nolo contendere* to a felony; or (v) the occurrence of a *"Change in Control"* as defined herein, provided the Executive exercises his right to resign no later than six months after the *Change in Control Effective Date*, as defined above.

*Section 3.2* The term of this Agreement and of Executive's employment hereunder shall commence on the Effective Date and shall continue until terminated as provided herein.

Case 1:08-cv-00177-RJA   Document 26-2   Filed 03/06/2008   Page 6 of 11

(a)      Upon the death or Disability of Executive;

(b)      By the Company immediately for Cause;

(c)      By the Company, without Cause, immediately upon giving Executive written notice;

(d)      By Executive immediately for Good Reason;

(e)      By mutual agreement between Executive and the Company; or

(f)      By Executive upon forty-five (45) days' advanced written notice, during which time Executive shall continue to perform his duties hereunder.

Section 3.4      *Remuneration.*  Except as otherwise specified herein, upon termination of Executive's employment hereunder pursuant to this Article IV, the Company shall have no further obligation to Executive or Executive's estate or personal representative in the case of death with respect to remuneration due under this Agreement, except for salary and vacation pay, earned but unpaid at the date of termination, and such amounts, if any, due Executive under Section 2 hereof but unpaid as of the date of termination.

Section 3.5      *Severance Payments.*   Upon termination of Executive's employment hereunder pursuant to Section 3.3(c) or 3.3(d), the Company shall pay to Executive, as severance pay hereunder, (i) an amount equal to twelve (12) months of his then-current salary in effect at the time of termination paid in six equal payments over the first six months following his Date of Termination (as defined below); (ii) COBRA premiums to provide continued medical coverage at Company expense for Executive and his family throughout the COBRA period; and (iii) a $15,000.00 allowance for outplacement services for Executive due on the first day of the month following termination.

Upon termination of Executive's employment pursuant to Section 3.3(a), this Agreement shall terminate and no further salary, benefits or compensation of any type shall be payable to the Executive after the date of termination, except that the Executive or the Executive's estate, heirs or beneficiaries, as applicable, shall be entitled to any benefits specifically provided to them or the Executive under any benefit plan, and all compensation earned but not yet paid.

Upon termination of Executive's employment pursuant to Section 3.3(b) or 3.3(e) or 3.3(f), this Agreement shall terminate and no further salary, benefits or compensation of any type other than amounts due under Section 2 but not yet paid as of the date of termination, shall be paid to the Executive under the terms of this Agreement after the date of termination, except the Executive shall retain the right to participate in benefit plans under Section 2.3 subject to the terms of those plans and applicable federal and state law.

Executive's equity interest in Partners shall not be forfeited by termination of his employment for any reason, and the rights of the parties as provided in Section 2.5, including

The parties recognize that the severance payments provided for in subsection (i) of the first paragraph of this Section 3.5 of this Agreement (the "Non-Exempt Payments") are subject to Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and agree to work together in good faith to amend this Agreement if necessary to comply with Section 409A of the Code. If securities of *Partners* (or any corporation, trade or business that would be treated as a single employer with *Partners* under Sections 414(b) or (c) of the Code) are publicly traded on an established securities market on the Executive's Date of Termination (as defined below), and the Executive is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code as of such date, then no Non-Exempt Payment shall be made to the Executive before the earlier of (i) the date which is six months after the Executive's Date of Termination or (ii) the date of the Executive's death, and any Non-Exempt Payment that would otherwise have been made to the Executive under this Agreement during such period shall be accumulated without interest and paid to the Executive on the earlier of such dates. For purposes of this Section 3.5, "Date of Termination" shall mean the date of the Executive's "separation from service" (as defined in Section 409A of the Code).

## ARTICLE IV

### MISCELLANEOUS

*Section 4.1    Assignment.*    This Agreement and the rights and obligations of the Company hereunder may be assigned by the Company to any subsidiary of or successor to the Company, and shall inure to the benefit of, shall be binding upon, and shall be enforceable by any such assignee, *provided* that any such assignee shall agree in writing to assume and be bound by this Agreement and a copy of such writing is delivered to Executive at the time of such assignment, and the Company shall remain liable hereunder. This Agreement and the rights and obligations of Executive hereunder may not be assigned by Executive.

*Section 4.2    Waiver.* This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties with respect to Executive's employment by the Company. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a waiver of waiver unless otherwise expressly provided. The Company, on the one hand, and Executive, on the other hand, may by written instrument only, (a) waive compliance with any of the covenants of the other party contained in this Agreement; and (b) waive the other party's performance of any of the obligations set out in this Agreement.

*Section 4.3    Choice of Law.* This Agreement and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

or other document to be given hereunder by any party to the others shall be in writing and delivered in person or by courier (effective when delivered), telegraphed, telexed or by facsimile transmission (effective when received) or mailed by certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged), as follows:

| | |
|---|---|
| If to the Company: | The Company's principal business address, to the Attention of the Managing Partner, which is presently: Ball Street Ventures, LLC 1000 Wisconsin Ave., NW, Suite G-100 Washington, DC  20007 Attn: Managing Partner |
| If to Executive: | Last address of Executive known to Managing Partner, Presently: 32 Hitchcock Road Westport, Connecticut, 06880 |

Section 4.5    Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

Section 4.6    Binding Effect.   The rights and obligations of the parties under this Agreement shall inure to the benefit of and shall be binding upon the respective representatives, successors and assigns of the Company, Partners, and Executive.  The Company and Partners represent and warrant to Executive that they have all necessary power, right, capacity, and authority to execute this Agreement, to consummate the transactions contemplated herein, and to perform this Agreement and related transactions.

[SIGNATURE PAGE TO FOLLOW.]

COMPANY:

BALL STREET VENTURES, LLC

By: _____
Brian K. Davis, Managing Partner

BALL STREET PARTNERS, LLC

By: _____
Brian K. Davis, Managing Partner

EXECUTIVE:

_____ 9/10/07
Bryan H. Simms

# PROMISSORY NOTE

August 29, 2007

In consideration of a loan from Lehman Brothers Inc. ("Lehman"), receipt of which is hereby acknowledged, the undersigned Bryan Simms (the "Borrower"), hereby promises to pay Lehman the principal sum of $742,857.16, with interest at the Firm's margin rate of interest, at its offices at 399 Park Ave, New York, New York, or to the order of Lehman. The Borrower hereby agrees to the following terms and conditions:

1.  <u>Payment</u>. The principal and interest shall be payable to Lehman through personal check or wire transfer on the following schedule:

    - September 10, 2008 - $297,142.86 (40% of the outstanding principal balance), plus accrued interest at the Firm's margin rate through the repayment date
    - September 10, 2009 – $445,714.30 (60% of the outstanding principal balance), plus accrued interest at the Firm's margin rate through the repayment date

    Interest at the Firm's margin rate of interest shall continue to accrue until the full amount of the outstanding loan, including accrued interest, is repaid to the Firm.

2.  <u>Prepayment</u>. The Borrower shall have the right at any time to prepay part or all of the unpaid principal, plus accrued interest through the date of payment, without penalty or premium.

3.  <u>Indemnification</u>. The Borrower further promises to pay and indemnify Lehman for all expenses incurred, including attorneys' fees, in connection with the collection of any amount due under this Note. The amount the Borrower may be liable for under this paragraph shall be the greater of the actual expenses incurred by Lehman or 15% of the unpaid balance of the Note at the time any proceedings are instituted for collection.

4.  <u>Default</u>. In the event of any default in payment under the terms of this Note for any reason whatsoever, the balance due hereunder will become immediately due and payable. The Borrower shall also be deemed to be in default hereunder if she is adjudicated bankrupt, makes an assignment for the benefit of creditors or files a petition for relief under the Bankruptcy Act.

5.  <u>Waivers</u>. The Borrower hereby waives presentment, demand for payment, notice of dishonor, protest and any and all other notices and demands in connection with the delivery, acceptance, performance, default or enforcement of this Note. No delay by the holder in exercising any power or right hereunder shall operate as a waiver of any power or right; nor shall any single or partial exercise of any power or right operate as such a waiver. No waiver or modification of the terms hereof shall be valid unless writing, signed by the holder of this Note and then only to the extent therein set forth.

6.  <u>Deductions</u>. Lehman shall have the right, without notice, to withhold from any amounts payable by Lehman to the undersigned, as salary, bonus, commissions, separation

payments, severance or otherwise, or to deduct monies from any security or commodity account the Borrower maintains with Lehman or from any amounts payable under any non-qualified deferred compensation, stock award or similar program or arrangement sponsored by Lehman or any of its affiliated companies, and to apply such withheld or deducted amounts to satisfy the indebtedness due under this Note. The Borrower hereby authorizes and consents to the aforementioned deductions.

7. <u>Arbitration</u>. The undersigned hereby agrees that any controversy arising out of or relating to this Note, or default on this Note, shall be submitted to and settled by arbitration pursuant to the constitution, by-laws, rules and regulations of the New York Stock Exchange or the National Association of Securities Dealers.

8. <u>Transferability</u>. The Borrower may not transfer any part of this loan to any other individual or entity.

9. <u>Governing Law</u>. This Note shall be governed by the substantive laws of the State of New York without regard to conflict of laws principles.

_____
Date

_____
Bryan Simms

STATE OF_____

COUNTY OF_____

SUBSCRIBED AND SWORN TO BEFORE ME ON_____2007.

_____
NOTARY PUBLIC

REDACTED

# EXHIBIT B

| 07/11/2008 | Minute Entry for proceedings held before Judge Richard W. Roberts: Scheduling Conference held on 7/11/2008, Motion to dismiss granted in part and denied in part; (Granted as to Defendants Davis, Laettner and Ball Street Fund); Motion to dismiss counts 2 and 3 of complaint denied without prejudice; Initial disclosures due 7/25/08; Plaintiff's expert witness designation due 9/9/08; Defendant's expert witness designation due 10/9/08; Amended Pleadings due by 8/18/2008., Discovery due by 11/10/2008., Dispositive Motions due by 12/15/2008., Joinder of Parties due by 8/18/2008., Status Conference set for 11/14/2008 09:15 AM in Courtroom 9 before Judge Richard W. Roberts.). (Court Reporter Scott Wallace.) (lin, ) (Entered: 07/11/2008) |

EXHIBIT C

Westlaw.

Slip Copy                                                                                      Page 1
Slip Copy, 2007 WL 3334500 (N.D.Ill.)
**2007 WL 3334500 (N.D.Ill.)**

**C**RehabCare Group East, Inc. v. Certified Health
Management, Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
REHABCARE GROUP EAST, INC. d/b/a
Rehabcare Group Therapy Services, Inc., Plaintiff,
v.
CERTIFIED HEALTH MANAGEMENT, INC., et
al., Defendants.
**No. 07 C 2923.**

Nov. 8, 2007.

<u>Adam K. Hollander</u>, <u>Alan J. Martin</u>, <u>Jaime L. Stilson</u>,
Mayer Brown LLP, Chicago, IL, <u>Phillip A. Martin</u>,
Fultz, Mfaddox, Hovious & Dickens PLC, Louisville,
KY, for Plaintiff.
<u>Matthew Thomas Gensburg</u>, <u>Tanisha Renae Jones</u>,
Greenberg Traurig, LLP, Chicago, IL, for
Defendants.

**MEMORANDUM OPINION AND ORDER**

<u>JAMES B. ZAGEL</u>, United States District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff RehabCare Group East, Inc. ("plaintiff"
or "rehabcare") Brings This six-count complaint
against Certified Health Management, Inc.
("Defendant" or "CHM"), an entity that manages
skilled nursing homes. While the motion to dismiss
before me now only involves CHM, Plaintiff also
brings its complaint against seven facilities that CHM
manages ("Facilities"). At bottom, this is a contract
dispute. The nub of Plaintiff's complaint is its
allegation that Defendant and the Facilities failed to
pay RehabCare for the therapy services RehabCare
provided. For the reasons stated below, CHM's
motion is granted in part and denied in part.

**II. DISCUSSION**

*A. Motion to Dismiss Standard*

A motion to dismiss tests the sufficiency of a
complaint, not the merits of a case. *Autry v.
Northwest Premium Servs., Inc.,* 144 F.3d 1037, 1039
(7Th Cir.1998). I must accept all well-pleaded factual
allegations in the complaint as true, drawing all
reasonable inferences from those facts in Plaintiff's
favor. *Cleveland v. Rotman,* 297 F.3d 569, 571 (7th
Cir.2002). I may grant the motion only if "no relief
could be granted under any set of facts that could be
proved consistent with the allegations."*Hishon v.
King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81
L.Ed.2d 59 (1984). That said, "a plaintiff's obligation
to provide the grounds of his entitlement to relief
requires more than labels and conclusions, and a
formulaic recitation of the elements of a cause of
action will not do. Factual allegations must be
enough to raise a right to relief above the speculative
level."*Bell Atlantic Corp. v. Twombly,* --- U.S. ----, --
-- - - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929
(2007) (internal citations and quotations omitted). As
the Seventh Circuit noted, "it is not enough for a
complaint to *avoid foreclosing* possible bases for
relief; it must actually *suggest* that the plaintiff has a
right to relief."*EEOC v. Concentra Health Services,
Inc.,* 496 F.3d 773, 496 F.3d 773, 777 (7th Cir.2007)
(emphasis in original). While the Supreme Court's
recent decision in *Bell Atlantic* may not have changed
the federal pleading standard to a fact-pleading
regime, "at some point the factual detail in a
complaint may be so sketchy that the complaint does
not provide the type of notice of the claim to which
the defendant is entitled."*Airborne Beepers & Video,
Inc. v. AT & T Mobility LLC,* --- F.3d ----, No. 06-
2949, 499 F.3d 663, 2007 WL 2406859, at \*4 (7th
Cir.2007).

*B. Counts I, IV, and V-Breach of Contract, Account
Stated, and Attorneys' Fees*

In Count I, RehabCare alleges a breach of contract
claim, Count IV alleges an "account stated" claim,
and Count V seeks attorneys' fees. CHM's motion to
dismiss these claims is premised on the simple fact
that it is not a party to any contract with Plaintiff.
RehabCare concedes this, but argues that its claims
against CHM are valid under the "alter ego" theory.
That is, it seeks to argue that CHM is so intertwined
with the Facilities that CHM should be held

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 2
Slip Copy, 2007 WL 3334500 (N.D.Ill.)
**2007 WL 3334500 (N.D.Ill.)**

responsible for the Facilities' obligations. RehabCare seeks to do this despite the "well-established principle that a corporation is separate and distinct as a legal entity from its shareholders, directors, and officers, and generally, from other corporations with which it may be affiliated."*Innkeepers' Telemanagement & Equip. Corp. v. Hummert Management Group, Inc.,* 841 F.Supp. 241, 245 (N.D.Ill.1993) (citation omitted).

*\*2* In order to employ the "alter ego" theory, RehabCare must "pierce the corporate veil." Under Illinois law,[FN1] courts will pierce the corporate veil where: (1) "the corporation was so controlled and manipulated that it had become a mere instrumentality of another" and (2) "recognition of a separate corporate identity would sanction a fraud or promote injustice."*Chicago Florsheim Shoe S. v. Cluett, Peabody & Co.,* 826 F.2d 725, 728 (7th Cir.1987). Parties seeking to pierce the corporate veil face a daunting hurdle. *See Pederson v. Paragon Pool Enterprises,* 214 Ill.App.3d 815, 158 Ill.Dec. 371, 574 N.E.2d 165, 167 (Ill.Ap.Ct.1991) ("Piercing [the] corporate veil is a task which courts should undertake reluctantly."); *see also Hornsby v. Hornsby's Stores, Inc.,* 734 F.Supp. 302, 307-08 (N.D.Ill.1990) (explaining that exceptions to the rule providing that corporations have separate identities are "not favored and are stringently applied"). The task is even more difficult in a breach of contract case. *See Main Bank of Chicago v. Baker,* 86 Ill.2d 188, 56 Ill.Dec. 14, 427 N.E.2d 94, 101 (Ill.1981) (holding that in a breach of contract case, "additional compelling facts," such as a finding of fraud, may also be required in order to pierce the corporate veil). Nevertheless, the question here is not whether Plaintiff can necessarily pierce the corporate veil, but whether its claim can survive a motion to dismiss, a much lower threshold. *Cf., Ermoian v. LaSalle Capital L.L.C.,* No. 07 C 1314, 2007 WL 1752206, at \*1 (N.D.Ill. June 15, 2007) (declining to grant individual defendants' motion to dismiss "with the understanding that their present retention in the case is limited to the potential of their liability on corporate-veil-piercing or alter-ego grounds").

> FN1. Both parties agree that Illinois law applies here.

Despite the lower threshold in this procedural posture, Plaintiff nevertheless fails to sufficiently

plead its breach of contract or account stated claims under the alter ego theory. As noted, Plaintiff must establish two facts in order to pierce the corporate veil. Plaintiff fails adequately to plead either one. For the first requirement, Plaintiff must plead that the Facilities were so controlled and manipulated that they had become mere instrumentalities of CHM. Plaintiff's attempt to do so comes in the form of its allegation that "upon information and belief, Defendants operate without respect for corporate formalities and in a manner that is inconsistent with their being separate and legal entities."This is insufficient, even under the liberal pleading requirements of FED.R.CIV.P. 8.

Numerous courts have granted motions to dismiss because the party seeking to pierce the corporate veil failed to adequately plead the alter ego doctrine.In *Classic Fire & Marine Ins. Co. v. Illinois Ins. Exchange.,* No. 97 C 1256, 1997 WL 767290 (N.D.Ill.Dec.3, 1997), the plaintiff asserted that two entities were "affiliate members of the same corporate group, and are subject to common control and ownership."The court deemed the plaintiff's "conclusory" pleading to be insufficient vis-a-vis the first requirement. *Id.* at \*5;*see also Hornsby,* 734 F.Supp. at 307-08 (mere allegation that corporations shared office space, office staff and directors is insufficient to suggest fraud or injustice or that one corporation was the alter ego of another); *Club Assistance Program, Inc. v. Zukerman,* 594 F.Supp. 341, 351 (N.D.Ill.1984).

*\*3* The court in *Trustees of Cement Masons Fund, Local 502 v. F & V Cement Contractors,* No. 02 C 3979, 2004 WL 765368, at \*3 (N.D.Ill. April 7, 2004), also determined that a plaintiff failed to sufficiently plead the alter ego doctrine. There, the plaintiff pled that one entity "controlled the actions of [another entity] and was at all times aware of the wrongful conduct of the company."*F & v. Cement Contractors,* 2004 WL 765368, at \*3. The court held that averment to be "the kind of barebones, conclusory allegation that has been found insufficient to state an alter ego claim even under the liberal notice pleading requirements of Federal Rule of Civil Procedure 8(a)."*Id.; see also Strojmaterialintorg v. Russian Am. Commercial Corp.,* 815 F.Supp. 103, 105 (E.D.N.Y.1993) (holding that conclusory allegations regarding the exercise of dominion and control are insufficient when attempting to plead the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 3
Slip Copy, 2007 WL 3334500 (N.D.Ill.)
**2007 WL 3334500 (N.D.Ill.)**

alter ego doctrine).

Like in *Classic Fire & Marine Ins. Co.* and *F & v. Cement Contractors,* Plaintiff's attempt to satisfy the first requirement of the alter ego doctrine is insufficient to withstand a motion to dismiss. RehabCare's allegation-that "upon information and belief, Defendants operate without respect for corporate formalities and in a manner that is inconsistent with their being separate and legal entities-is precisely the type of formulaic, skeletal conclusion that were found lacking in *Classic Fire & Marine Ins. Co.* and *F & v. Cement Contractors.* Furthermore, even if I were to deem this sufficient for the first requirement, Plaintiff's complaint does not even allege that the second requirement has been satisfied.

As against CHM, Counts I, IV, and V of Plaintiff's complaint are premised upon the alter ego doctrine. Because Plaintiff fails to satisfactorily plead that theory here, Defendant's motion to dismiss Counts I, IV and V (as against CHM) is granted.

*C. Count II-Promissory Estoppel*

In Count II, Plaintiff asserts a claim for promissory estoppel. "To plead a cause of action for promissory estoppel, plaintiff must allege that (1) defendants made an unambiguous promise to plaintiff; (2) plaintiff relied on this promise; (3) plaintiff's reliance was expected and foreseeable by defendants; and (4) plaintiff relied to his detriment." *Robinson v. BDO Seidman, LLP,* 367 Ill.App.3d 366, 305 Ill.Dec. 175, 854 N.E.2d 767, 773 (Ill.App.Ct.2006) (*quoting Jago v. Miller Fluid Power Corp.,* 245 Ill.App.3d 876, 185 Ill.Dec. 785, 615 N.E.2d 80 (Ill.App.Ct.1993)).

Defendant's first line of attack on this Count argues that promissory estoppel is no longer recognized as an offensive cause of action in Illinois. To be sure, some intermediate courts of appeal in Illinois have held that promissory estoppel can no longer be pled as a cause of action, but rather only as an affirmative defense. *See, e.g., Dewitt v. Fleming,* 357 Ill.App.3d 571, 293 Ill.Dec. 446, 828 N.E.2d 756 (Ill.App.Ct.2005); *ESM Dev. Corp. v. Dawson,* 342 Ill.App.3d 688, 277 Ill.Dec. 30, 795 N.E.2d 397, 403 (Ill.App.Ct.2003). However, the Illinois Supreme Court's most recent statement on promissory estoppel was not definitive on this question. *See Quake*

*Constr., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990 (Ill.1990). Moreover, there is disagreement amongst the Illinois courts as to whether *Dewitt* and *ESM* reflect the position of the Illinois Supreme Court. *See, e.g., Chatham Surgicore, Ltd. v. Health Care Serv. Corp.,* M826 N.E.2d 970, 975 (Ill.App.Ct.2005) (citing *Quake* and holding that plaintiff stated an affirmative claim for promissory estoppel). Several courts sitting in diversity in this district have declined to adopt the "novel" theory that promissory estoppel can no longer be pled as an offensive cause of action in Illinois. *See Kamboj v. Eli Lilly & Co.,* No. 05 C 4023, 2007 WL 178434, at *10 (N.D.Ill. January 18, 2007); *TNT Logistics North America, Inc. v. Bailly Ridge TNT, LLC,* No. 05 C 7219, 2006 WL 2726224, at *10 (N.D.Ill. September 21, 2006); *LM Insurance Corp. v. Sourceone Group, Inc.,* 454 F.Supp.2d 727, 741 (N.D.Ill.2006)("*Quake*... still stands as the governing law in Illinois concerning promissory estoppel."). I agree with the other judges on this Court; while exercising diversity jurisdiction, I am unwilling to adopt the position of the Dewitt and ESM courts absent a more definite statement from the Supreme Court of Illinois.

*4 Plaintiff sufficiently pleads the elements of a promissory estoppel claim. RehabCare claims that CHM promised to pay for Plaintiff's services. Plaintiff further claims that it relied on this promise and continued providing services. Plaintiff asserts that its reliance was reasonable, and lastly, it states that its reliance resulted in damages.

The fact that Plaintiff has overcome the low hurdle of the lax federal pleading standards obviously does not necessarily mean that it will be able to recover on this theory. CHM cites to both *Dumas v. Infinity Broadcasting Corp.,* 416 F.3d 671 (7th Cir.2005) and *Kamboj,* both of which may ultimately frustrate RehabCare's efforts to prevail. Nevertheless, the *Kamboj* court disposed of the plaintiff's claim on summary judgment. 2007 WL 178434, at *10. Similarly, the Seventh Circuit in *Dumas* was reviewing a district court's grant of summary judgment. 416 F.3d at 672. Because the procedural posture is different here, those authorities fail to counsel in favor of the result CHM seeks. Defendant's motion to dismiss Count II is denied.

*D. Count III-Unjust Enrichment*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3334500 (N.D.Ill.)
**2007 WL 3334500 (N.D.Ill.)**

Page 4

In Count III, Plaintiff seeks recovery based on the theory of unjust enrichment. To state a cause of action based on a theory of unjust enrichment, RehabCare must allege that CHM "has unjustly retained a benefit to [RehabCare's] detriment, and that [CHM's] retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (Ill.1989). Plaintiff's unjust enrichment claim is non-traditional in the same way as the plaintiff's claim in *HPI* was. Here, as there, Plaintiff "is seeking recovery of a benefit that was transferred to the defendant by a third party" as opposed to a benefit that Plaintiff itself transferred. *Id.* In this case, RehabCare seeks to recover any funds that CHM may have received from the federal government via the Medicare program.

In a situations like this, where an unjust enrichment claim is based on a benefit transferred from a third party to the defendant, Plaintiff must establish one of three propositions in order to recover. Plaintiff must establish either that:

(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant.

*Id.* (internal citations omitted). In this case, Plaintiff relies on the third option and argues that it had a better claim than CHM to the Medicare funds. The parties engage in a minor dust-up concerning materials RehabCare attached to its response brief about the Medicare payments. I need not consider these exhibits at this stage, and in fact, I did not consider them. The allegations in the complaint put CHM on notice of the substance of RehabCare's unjust enrichment claim. Whether RebabCare will ultimately be able to prevail on this claim is a question for another day. Consequently, the motion to dismiss Count III is denied.

*E. Count VI-Tortious Interference with Contract*

**\*5** In Count VI, RehabCare alleges tortious interference with contract (also referred to as

intentional interference with contract rights. In Illinois, the elements of this tort are:

(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

*HPI,* 137 Ill.Dec. 19, 545 N.E.2d at 672 (citing *Prudential Ins. Co. v. Van Matre,* 158 Ill.App.3d 298, 110 Ill.Dec. 563, 511 N.E.2d 740 (Ill.App.Ct.1987).

RehabCare adequately pleads all of these elements. However, this does not end the inquiry. The *HPI* court, in a factually analogous situation, noted that "where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious." *Id.* at 677. The *HPI* court went on to state hospital management companies enjoy a privilege with regard to the entities they manage. *Id.* ("[T]he duty owed by hospital management companies to their hospitals should take precedence over their duty to the hospitals' contract creditors."). Based on the sound reasoning in *HPI,* I find that CHM-like the defendant in *HPI-*enjoys at least some privilege with regard to the Facilities.

The fact that CHN enjoys the privilege is not, in and of itself, dispositive though. The existence of the privilege means only that in addition to the above-listed elements, RehabCare must *also* allege that CHM acted in a malicious or unjustified manner. *See HPI,* 137 Ill.Dec. 19, 545 N.E.2d at 677 ("[W]here the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious.").

CHM argues, based on *HPI,* that I should dismiss Count VI because RehabCare failed to make these additional allegations that are required as a result of the privilege. However, RehabCare's failure to sufficiently allege that CHM's conduct was unjustified may not be fatal. That is because the *HPI* court also pointed out that "[a] defendant who is protected by a privilege ... is not justified in engaging

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3334500 (N.D.Ill.)
**2007 WL 3334500 (N.D.Ill.)**

Page 5

in conduct which is totally unrelated or even antagonistic to the interest which gave rise to defendant's privilege."*Id.* at 678.As an example, the court stated that

a hospital management company, whose privilege is based upon the management company's role in exercising business judgment on behalf of the company's hospital, would not be justified in inducing a breach of contract *solely for the management company's gain...* since such conduct would not have been done to further the hospital's interests.

*Id.* So while RehabCare does not sufficiently allege malice, it may nevertheless be able to prevail if it can establish that CHM was acting solely for its own gain, as opposed to on behalf of the Facilities. It is this possibility that rescues Count VI of Plaintiff's complaint.

## V. *CONCLUSION*

**\*6** For the aforementioned reasons, CHM's motion to dismiss is granted as to Counts I, IV and V and denied as to Counts II, III, and VI.

N.D.Ill.,2007.
RehabCare Group East, Inc. v. Certified Health Management, Inc.
Slip Copy, 2007 WL 3334500 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Slip Copy
Slip Copy, 2007 WL 2725944 (E.D.Tenn.)
**2007 WL 2725944 (E.D.Tenn.)**

Page 1

**C** Wierbicki v. Advatech, LLC
E.D.Tenn.,2007.
Only the Westlaw citation is currently available.
United States District Court, E.D. Tennessee.
Alex E. WIERBICKI, Plaintiff,
v.
ADVATECH, LLC, URS Corporation, and
Mitsubishi Heavy Industries America, Inc.,
Defendants.
**No. 1:06-CV-269.**

Sept. 17, 2007.

Valerie W. Epstein, Berke, Berke & Berke,
Chattanooga, TN, for Plaintiff.
Joel T. Galanter, Adams and Reese, LLP, Waverly D.
Crenshaw, Jr., Waller, Lansden, Dortch & Davis,
PLLC, Nashville, TN, for Defendants.

*MEMORANDUM*

CURTIS L. COLLIER, United States Chief District
Judge.
**\*1** This case arises from an employment dispute
between plaintiff Alex Wierbicki ("Plaintiff") and his
former employer, whose identity is somewhat
ambiguous based on wording in the complaint.
Before the Court is defendant Mitsubishi Heavy
Industries America, Inc.'s [FN1] ("MHIA") motion to
dismiss and supporting memorandum (Doc. Nos. 7 &
8). This motion requests the Court to dismiss
Plaintiff's retaliatory discharge claim against MHIA.
Plaintiff filed a response in opposition (Doc. No. 12),
and MHIA filed a reply (Doc. No. 15). On August
16, 2007, MHIA filed a memorandum or motion to
dismiss (Doc. No. 16), which addresses Plaintiff's
breach of contract claim against it. Plaintiff filed a
response brief (Doc. No. 17) and MHIA filed a reply
brief (Doc. No. 18).

> FN1. In the memorandum supporting its first
> motion to dismiss, MHIA states it was
> incorrectly identified in Plaintiff's complaint
> as Mitsubishi Heavy Industries American,
> Ltd. (Doc. No. 8). In this Memorandum and
> the accompanying order, the Court will use
> "Inc." in the caption.

For the following reasons, the Court will **GRANT**
MHIA's two motions and will **DISMISS** all
Plaintiff's claims against MHIA.

**I. *FACTS & PROCEDURAL HISTORY***

On October 31, 2006, Plaintiff filed a complaint in
the Chancery Court for Hamilton County against
defendants Advatech, LLC ("Advatech"), URS
Corporation ("URS") and MHIA (collectively
"Defendants"). Plaintiff alleged claims for retaliatory
discharge in violation of the Tennessee Public
Protection Act ("TPPA"), Tenn.Code Ann. § 50-1-
304, [FN2] and for breach of contract, i.e. breach of his
employment agreement. Plaintiff asserts these claims
against all three Defendants (Doc. No. 1-2,
"Compl.").[FN3] On December 21, 2006, Defendants
removed the complaint to this Court under federal
diversity jurisdiction (Doc. No. 1).

> FN2. Plaintiff passingly mentions that
> Defendants' conduct was "illegal under the
> False Claims Act ("FCA"), 31 U.S.C. §
> 3730."Nowhere else in the complaint or in
> any later filing does Plaintiff attempt to
> make out an FCA claim, which requires
> service on and action by the federal
> Government. It appears Plaintiff was only
> citing the FCA as a way to show
> *Defendants'* conduct was illegal as required
> by the TPPA, and this Court does not find
> Plaintiff asserts an FCA cause of action.

> FN3. Advatech is a joint venture between
> URS and MHIA (Doc. No. 1-2, ¶ 3).

The complaint alleges that on February 9, 2004
Plaintiff was hired by Advatech as a "Project
Procurement Manager (designated Subcontracts
Lead)" for multiple projects, for a minimum eight-to
ten-year term of employment (Compl.¶ 6). Plaintiff's
job was to prepare, review, evaluate bids, and award
subcontracts to selected subcontractors on Tennessee
Valley Authority ("TVA") projects (*id.* ¶ 7). TVA
work amounted to a majority of Advatech's business.
Beginning in June 2005, Plaintiff became aware that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

at least one subcontractor had received confidential information which permitted it to unfairly bid on a TVA project. Specifically, Plaintiff alleges that Gary Ferguson, Advatech's Vice President, gave confidential information to a company called Performance Contracting, Inc., (*id.* ¶ 8). Plaintiff labels this practice as "bid rigging." Plaintiff informed Advatech management, the URS Human Resources Department, and URS Divisional Counsel (the Corporate Ethics unit) of the "bid rigging" practices. In-house counsel asked Plaintiff to meet with attorneys from Baker, Donelson, Bearman, Caldwell & Berkowitz, PC in Chattanooga, Tennessee, which Plaintiff did on July 11, 2005 (*id.* ¶ 9). On July 15, 2005, Plaintiff was removed from all TVA jobs. On July 18, 2005, Plaintiff filed a formal complaint with "Defendant's Human Resources Department" (*id.* ¶ 11).[FN4] Plaintiff continued to work at Advatech until he had surgery; to recuperate, he used his vacation and severance pay and was paid through November 4, 2005, when he was apparently fired (*id.*)("Plaintiff was forced to find another job and moved to another state"). Plaintiff alleges his work performance was good, and he was not discharged until he reported what he felt were illegal practices to management (*id.* ¶ 12) (alleging cover-up to keep TVA relationship).

> FN4. It is unclear to which defendant Plaintiff is referring.

**\*2** In response to Plaintiff's complaint, MHIA filed a motion to dismiss (Doc. No. 7), stating it did not employ Plaintiff and has never employed Plaintiff; therefore, Plaintiff failed to state a claim against MHIA upon which relief could be granted (Doc. No. 8, p. 1).[FN5] MHIA argues that its only connection to this suit is its involvement in Advatech. MHIA also notes Plaintiff failed to plead it was his employer (*id.* at 3). In fact, Plaintiff specifically avers an employment relationship with only one defendant, Advatech, does not claim to have reported wrongdoing to MHIA, and does not allege MHIA discharged him from his position (*id.* at 2). Plaintiff's complaint is somewhat ambiguous as it often generically refers to "Defendants" without defining that term; however, the specific factual averments in the complaint involve Advatech and URS. For example, Plaintiff avers Advatech was his employer (*id.*)(citing Compl. ¶ 6), Advatech engaged in wrongdoing (*id.*)(citing Compl. ¶ 8), Plaintiff

complained about illegal practices to Advatech and URS (*id.*)(citing Compl. ¶¶ 9, 11), and Advatech allegedly discharged Plaintiff to cover up its activities (*id.*)(citing Compl. ¶¶ 11-12).

> FN5. Also pending before the Court is Advatech and URS's motion to stay or in the alternative, motion to dismiss (Doc. No. 9) as well as Plaintiff's motion to stay pending arbitration (Doc. No. 11). The Court will address these motions in a separate order.

Construed in the light most favorable to Plaintiff, the complaint alleges a cause of action for breach of contract against MHIA (Compl.¶ 12) ("Defendants breached their employment agreement with Plaintiff by discharging him early."). In a telephone status conference held July 30, 2007, the Court notified MHIA that its first motion to dismiss did not address this breach of contract claim. MHIA filed a second memorandum of law in support of its motion to dismiss on August 6, 2007 (Doc. No. 16).[FN6] Plaintiff responded in opposition (Doc. No. 17), and MHIA replied (Doc. No. 18).

> FN6. MHIA filed only a memorandum of law. The Court will construe this memorandum as either containing within it a motion to dismiss the breach of contract claim, or as amending MHIA's first motion to dismiss (Doc. No. 7) to address the two causes of action against MHIA (*see id.* at 1).

## II. *STANDARD OF REVIEW*

When reviewing a Fed.R.Civ.P. 12(b)(6) motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff, *Bloch v. Ribar, 156 F.3d 673, 677 (6th Cir.1998)*, accept the complaint's factual allegations as true, *Broyde v. Gotham Tower, Inc., 13 F.3d 994, 996 (6th Cir.1994)*, and determine whether plaintiff has pleaded "enough facts to state a claim to relief that is plausible on its face,"*Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1974 (May 21, 2007)* (rejecting the traditional 12(b)(6) standard set forth in *Conley v. Gibson, 355 U.S. 41, 45-46 (1957)*). In deciding a motion to dismiss, the question is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support his claims. *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002)*. At the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 3
Slip Copy, 2007 WL 2725944 (E.D.Tenn.)
**2007 WL 2725944 (E.D.Tenn.)**

same time, bare assertions of legal conclusions are insufficient, and the "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988) (emphasis in original).

## III. *DISCUSSION*

### A. THE PARTIES' ARGUMENTS

\*3 MHIA's first motion to dismiss argues that Plaintiff's sole claim against it fails to state a claim for relief because it is a parent corporation which cannot be considered Plaintiff's employer, and thus could not be liable under the TPAA for retaliatory discharge (Doc. No. 8, p. 1). MHIA's second memorandum/motion to dismiss reiterates it was never Plaintiff's employer and never entered into any contractual relationship with him which it could breach (Doc. No. 16, p. 1). MHIA stresses it was simply a member in a limited liability company, and this relationship is "legally inadequate" to impute another entity's liability to MHIA (*id.* at 2).[FN7]

> FN7. MHIA points out there is only one contract referenced in the complaint, the letter from URS to Plaintiff stating he would be employed for "eight to ten years" (Doc. No. 16, p. 2-3).

In response, Plaintiff claims Defendants admit Advatech was a "joint venture" between URS and MHIA with URS as managing member (Doc. No. 12, p. 1). However, Plaintiff cites a brief filed by Advatech and URS (Doc. No. 10, p. 1) and not the defendant relevant in this analysis, MHIA. Plaintiff asserts MHIA should be held vicariously liable for the actions of the other members of its "joint venture" (Doc. No. 12, p. 1). To support this point Plaintiff relies on two Tennessee cases, but the facts of these cases are distinguishable.[FN8] Plaintiff also relies on *Prosser & Keeton on the Law of Torts* (5th ed.1984), which analogizes joint ventures to partnerships (*id.* at 1-2). However, at no point does Plaintiff address the employer-employee issue raised by MHIA in its motion to dismiss.

> FN8. Plaintiff relies on *Fain v. O'Connell,* 909 S.W.2d 790 (Tenn.1995), which

involved a suit by a parishioner against a diocese for a slip-and-fall in a church parking lot; the court rejected a rule that barred suit against an unincorporated association by a member of the association. *Id.* at 791-94. *Fain* cites both *Prosser* and *Cole v. Woods,* 548 S. W.2d 640 (Tenn.1977), which Plaintiff also cites. *Cole* involved a question of contributory negligence in an automobile crash; the court held, "the negligence of those engaged in a joint enterprise or joint venture may be imputed to the other members," but the ruling was confined to factually similar cases. *Id.* at 650-51.

MHIA's reply to Plaintiff's response points to the inapplicability of Plaintiff's cited cases as well as Plaintiff's failure to address the employer-employee status issue (Doc. No. 15, p. 3). MHIA argues that it and URS are only legally related by their joint formation of Advatech, a limited liability company ("LLC") (*id.* at 2). While URS may act in some employment capacity to Advatech, MHIA does not (*id.* at 1-2). MHIA avers it cannot be found liable because the existence of an employment relationship is a required element for a TPPA claim; MHIA also refutes Plaintiff's contention that URS and it could be considered "general partners" and therefore vicariously liable for each other's actions. MHIA emphasizes, by forming an LLC, it is shielded from the type of liability Plaintiff is attempted to impute to it. MHIA argues this point even more strongly in its second memorandum/motion to dismiss, in which it points out:

Advatech, LLC is a Delaware limited liability company, governed by the Delaware Limited Liability Company Act. Under the Act, "the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company." Del.Code Ann. tit. 6, § 18-303(a). As a member in an LLC, MHIA is not legally responsible for the liabilities of Advatech, LLC. This Court has recognized

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 4
Slip Copy, 2007 WL 2725944 (E.D.Tenn.)
**2007 WL 2725944 (E.D.Tenn.)**

previously that Delaware law prevents a plaintiff from pursuing a breach of contract claim against a member of an LLC when the contract is between the LLC and the plaintiff, absent exceptional circumstances that have not been alleged in this case. *Swift Freedom Aviation, LLC v. R.H. Aero,* 2005 WL 2246256, *7 (E.D.Tenn. Sept. 13, 2005).

*4 (Doc. No. 16, p. 3-4). In response to this motion, Plaintiff submits evidence of an employment contract with "the defendants," without precisely identifying *which* defendant or addressing MHIA's contention regarding limited liability (Doc. No. 17, p. 1-3). MHIA emphasizes this "inexplicable avoidance" in its reply brief,[FN9] and also points out the job offer letter, written to Plaintiff on behalf of URS, specifically describes the employment relationship as "at will" (Doc. No. 18, p. 1) (citing Doc. No. 10[-2] ).

> FN9. Doc. No. 16, p. 2 (docket citations omitted):
>
> Plaintiff alleges no privity of contract with MHIA. Plaintiff does not allege that he had an employment contract with MHIA. In the Complaint, he alleges that he was employed by Advatech, and in his Response, he alleges an oral contract based on his conversations with Marvin Fisher and other agents or employees of URS or Advatech. This wholly undercuts his breach of contract claim against MHIA. It is well established under Tennessee law that "[p]rivity of contract is an essential element to an action founded on a breach of contract...."*Tipton v. Sparta Water Co.,* 57 S.W.2d 793, 795 (Tenn.1933). All of Plaintiff's allegations about the formation of an employment contract, whether written or oral, involve URS and Advatech, not MHIA. Plaintiff fails to establish or even allege privity of contract with MHIA.

## B.    LIABILITY    FOR    RETALIATORY DISCHARGE UNDER THE TPPA

The first issue is whether MHIA can be held liable as Plaintiff's employer under the TPPA. Tenn.Code Ann. § 50-1-304(a), provides: "No employee shall be discharged or terminated solely for refusing to

participate in, or refusing to remain silent about, illegal activities."This Court has recognized the following four essential elements to make out a TPPA claim:

(1) the plaintiff must be the defendant's employee;

(2) the plaintiff must refuse to participate in or to remain silent about illegal activities;

(3) the defendant-employer must discharge the plaintiff-employee; and

(4) an "exclusive causal relationship" must exist between the plaintiff's refusal to participate in or remain silent about illegal activities and the defendant's termination of the plaintiff-employee.

*Griggs v. Coca-Cola Employees' Credit Union,* 909 F.Supp. 1066, 1069 (E.D.Tenn.1995).

Here, MHIA specifically challenges the first element, and Plaintiff has provided no evidence to support this Court finding an employment relationship between him and MHIA. The offer letter (Doc. No. 10-2) is clearly between URS and Plaintiff; MHIA avers the employment discussions to which Plaintiff refers were all with URS or Advatech employees and Plaintiff has not refuted this contention. The one way Plaintiff could demonstrate MHIA's liability would be to prove it was responsible or vicariously liable for Advatech or URS' conduct; as MHIA points out, Plaintiff has failed to provide credible evidence that "Advatech, LLC" is *not* a limited liability company offering liability protection to its members but is instead a "joint venture" or partnership. Under Delaware law, as MHIA cites, the members of LLCs are not responsible for the debts and obligations of the LLC itself. Del.Code Ann. tit. 6, § 18-303(a). The same is true in Tennessee. *See*Tenn.Code Ann. § 48-217-101(1) ( "a member, holder of financial interest, governor, manager, employee or other agent of an LLC does not have any personal obligation and is not otherwise personally liable for the acts, debts, liabilities, or obligations of the LLC whether such arise in contract, tort or otherwise."); *see also Causey v. Lachmandes,* No. 3:04-0797, 2005 WL 2000625 at *5 (M.D.Tenn. Aug. 18, 2005) (construing § 48-217-101, noting "one exception exists where the member, holder, or agent is personally liable 'by reason of such person's own acts or conduct,' " and finding the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2725944 (E.D.Tenn.)
**2007 WL 2725944 (E.D.Tenn.)**

Page 5

members of an LLC were not liable for the shooting of a guest at a hotel the LLC owned).

**\*5** Accordingly, this Court finds no employment relationship existed and will **GRANT** MHIA's first motion to dismiss (Doc. No. 7) as to this claim.

## C. BREACH OF CONTRACT

In the same vein, in order to be liable for breach of an employment contract, MHIA would have to have been Plaintiff's employer. As this Court has already found, Plaintiff failed to allege an employment relationship with MHIA. MHIA is explicitly mentioned in the complaint only twice. First, Plaintiff alleges Advatech is a "joint venture between Mitsubishi Heavy Industries, Ltd. and URS Corporation" (Compl., ¶ 3). Second, Plaintiff alleges "Mitsubishi Heavy Industries America, Ltd. is a corporation operating under the laws of the State of Tennessee and actively engaged in business in the State of Tennessee"(*id.* ¶ 4). Even after MHIA has again and again argued that Plaintiff is not an MHIA employee, Plaintiff has again and again failed to make such assertion. In his response to MHIA's first motion to dismiss, Plaintiff simply argues MHIA is vicariously liable for the acts of URS and Advatech. In response to MHIA's second memorandum/ motion to dismiss, Plaintiff offers evidence of an oral employment contract, but does not specifically name MHIA as his employer. The holes in Plaintiff's arguments further illustrate that MHIA's only link to this case is in its status as a member company of Advatech.

Accordingly, even viewed in the light most favorable to Plaintiff, Plaintiff has failed to show any specific "employment contract" with MHIA, and the Court must **DISMISS** Plaintiff's breach of contract claim against MHIA.

## IV. *CONCLUSION*

For the foregoing reasons, the Court will **GRANT** both MHIA's motion to dismiss the TPPA claim (Doc. No. 7) and MHIA's putative second motion to dismiss the breach of contract claim (Doc. No. 16). In sum, all Plaintiff's claims against defendant Mitsubishi Heavy Industries America, Inc. will be **DISMISSED WITH PREJUDICE.**

An Order will enter.

E.D.Tenn.,2007.
Wierbicki v. Advatech, LLC
Slip Copy, 2007 WL 2725944 (E.D.Tenn.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRYAN H. SIMMS** : | |
| : | |
| : | |
| **Plaintiff,** : | |
| : | **Case: 1:08-cv-00177-RWR** |
| v. : | ~~Hon. Richard W. Roberts~~ |
| : | |
| **BALL STREET VENTURES, LLC, et al.** : | |
| : | |
| **Defendants.** : | |
| : | |

## ORDER

Having read and considered Plaintiff Bryan H. Simms' Motion to File a First Amended Complaint, and the Memorandum of Points and Authorities in Opposition, as filed by Defendants Ball Street Ventures, LLC ("Ventures"), Ball Street Partners, LLC ("Partners"), (Collectively "Defendants"), it is, this ____ day of _____, 2008,

**ORDERED** that Plaintiff's Motion to File a First Amended Complaint, is **DENIED**.


_____
**Richard W. Roberts, Judge**
United States District Court
for the District of Columbia

Copies to:
Jeffrey S. Jacobovitz, Esq.
Schiff Hardin LLP
1666 K Street, N.W., Suite 300
Washington, D.C. 20006
Fax: (202) 778-6460
Email: jjacobovitz@schiffhardin.com

Alisa H. Reff, Esq.
Drinker, Biddle & Reath LLP
1500 K Street, N.W.
Washington, D.C. 20005-1209
Fax: (202) 842-8465
Email: Alisa.Reff@dbr.com

Thomas J. Barton, Esq.
James G. Fannon, Esq.
Drinker, Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Fax: (215) 988-2757
Email: Thomas.Barton@dbr.com
Email: James.Fannon@dbr.com

## CERTIFICATE OF SERVICE

I, Jeffrey S. Jacobovitz, an attorney, on **August 6, 2008**, caused a true and correct copy of

*Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's Motion to File a*

*First Amended Complaint,* to be served upon the following via CM/ECF and U.S. Mail:

---

Alisa H. Reff, Esq.
D.C. Bar No. 423113
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, D.C. 20005-1209
Tel:  (202) 842-8852
Fax:  (202) 842-8465
Email:  Alisa.Reff@dbr.com

Thomas J. Barton, Esq.
James G. Fannon, Esq.
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Tel:  (215) 988-2863
Fax:  (215) 988-2757
Email:  Thomas.Barton@dbr.com
Email:  James.Fannon@dbr.com


_____/s/ Jeffrey S. Jacobovitz_____
Jeffrey S. Jacobovitz